# GEORGE W. HYDE

*vs.*

# SYDNEY C. BLUMENTHAL AND ALEXANDER KAHN, TRADING AS BLUMENTHAL & KAHN ELECTRIC COMPANY, FOR THE USE OF THE NEW AMSTERDAM CASUALTY COMPANY, FOR THE USE OF WILLIAM M. MORAN.

*Contributory Negligence—Stranger Using Rear Entrance—Unlighted Hall.*

One who visited defendant's building to repair an electric appliance therein, and fell down an elevator shaft, *held* guilty of contributory negligence in entering the building from the rear and passing along a somewhat dark passage without any invitation to do so, his only previous visit to the building having been by the front entrance, on which occasion he might have seen a posted notice requiring employees to enter and leave only from the front.

*Decided June 16th, 1920.*

Appeal from the Court of Common Pleas of Baltimore City (STANTON, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and ADKINS, JJ.

*Vernon Cook* and *George Ross Veazey*, for the appellant.

*Charles F. Harley* and *George A. Soller*, with whom was *George C. Thomas* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the Court.

This is an appeal from a judgment for $7,500.00 in favor of an employer for the use of the insurer and for the use of an employee, who was injured while on the premises of a third party.

It appears from the record that on the happening of the accident, Moran, the employee, applied for compensation to the State Accident Commission and was awarded $12.00 a week to be paid by the Blumenthal-Kahn Company, employer, and the New Amsterdam Casualty Company, insurer, and that after receiving about $669.00 under this award, he thought he was able to work and signed a paper giving up his weekly allowance. This suit was subsequently entered against the appellant. The facts of the case are substantially as follows:

George W. Hyde, the appellant, in September, 1917, was the proprietor of lunch rooms at 322 and 324 North Howard Street, in Baltimore City. On September 18th, 1917, William M. Moran, an employee of the Blumenthal-Kahn Electric Company, the appellee herein, was sent by appellee to make some repairs to a motor in the kitchen of appellant in the third story of appellant's building, appellee having been employed to do this work. The dining room fronts on the west side of Howard Street and the north half of the room extends back a distance of about 50 feet from the rear wall of the building on State Street, and the southern half extends back to within about 10 or 12 feet from said rear wall. The pantry is located in the northwestern section of the first floor in the L formed by the two sections of the dining room and is on the same level with the dining room. There is a public entrance to the dining room on the Howard Street front. The rear entrance to the building on State Street opens into a hallway which runs along the north wall of the building. This hallway is about 20 feet 6 inches long and about 4 or 5 feet wide. At the end of this hallway is an elevator. On the south side of the hall, at the distance of about 14 feet from the entrance, is a door from the hallway which leads down into the pantry by a stairway of five or six steps, the hallway being on a level 4 feet 6 inches higher than the level of the pantry floor. This door is about 3 feet wide, and the distance from the east side of the doorway to the elevator shaft is 3 feet 3 inches. On the right of these steps leading

to the pantry floor is the wall constituting the back or west wall of the pantry. To the left there is no wall or railing, the stairway being an open one, the steps being wholly within the pantry. There is an entrance to the elevator from the pantry level. There is a spiral stairway in the pantry about 10 feet east of the elevator shaft, and located along the northern wall of the pantry, and this spiral stairway leads from the pantry to the floors above, and is about 10 feet distant from the elevator shaft. The elevator shaft has doors opening outward on the pantry level. The doorway at the State Street entrance takes up nearly the entire hall space.

The main stairway to the lunch room on the second floor is in the front of the dining room on the south side thereof, and there is a passenger elevator located near this stairway. There is no passageway on the same level from the foot of the spiral stairway in the pantry to State Street. It is necessary to ascend the steps from the pantry to the hallway leading into State Street in order to get out that way. State Street is a narrow street or alley from 15 to 17 feet wide.

When Moran came to work the first day he entered the building through the front or Howard Street entrance. According to his testimony he arrived there at 9 or 10 o'clock in the morning, met a Mr. Sterling, whom he took to be the manager, and told him his business, showing him his slip. Sterling took him by the shoulder and led him back to the spiral staircase leading to the kitchen on the third floor. "When he got out by the hall leading to the spiral stairs," he let go his shoulder. Witness did not finish on September 18th. When he left the building that day he came out the back way, through the pantry, up the steps to the hall and through the hall to State Street. As he went out everything was safe and the door was open, "and I thought I could use the back way just as well as the front, and I went out the back way—everything looked safe when I went out there." When he returned the next morning about 7:45 to finish the work he came in the same way he went out the day before. The doors were open as he walked through the hall. "I

walked out this hall, and it is about five feet wide, and I walked right down this elevator shaft." He did not see any elevator shaft there the day before; when he came it was closed in. In answer to the question what, if any, protection was there to the shaft at that time, he replied: "I could not have fell if there was any protection there at all. There was none there at all, and there was a chain hanging down on both sides, half on each side of the door." He further testified that he did not break the chain in the fall; that it was open when he went down; that the elevator doors, opening on the hall, were not closed and there was no light there at all; that there was an old electric light there but it was out of use being broken; that he fell about twenty feet and was severely injured. Witness further testified he had never been in the building until the day before the accident when he entered by the front door, and, without instruction or permission, left by the rear door; that when he returned the morning of the accident and entered the rear door through which he had passed in leaving the building on the only other occasion he was ever there, he found there was no light in the hall and it was so dark he could not find the opening or door leading into the pantry for which he was looking, and it was while looking for this opening that he got by it and walked into the elevator shaft; that there was neither daylight nor electric light in the hall, except such as was reflected from the alley; that the elevator door leading into the pantry was closed at the time of the accident, but after he was hurt the door was opened, "and then you could see because the light then reflected up through the elevator shaft"; that at the time of the accident there was no light at all. In answer to the question whether it was so dark he could not see his hand in front of his face, he replied: "I won't say that bad, but it might have been." He also was unable to say whether he was walking slowly or fast.

Appellant testified that the electric light fixture in the hall had been out of use for a long time; that it was broken shortly after it was installed and was never repaired because

the hall was lighted by a transom over the rear door and by electric lights in the pantry which were reflected through the door leading directly into the hall from the pantry and through the door opening into the elevator from the pantry, which doors were left open. Other witnesses for appellant testified these doors were always open. No one, however, was present just at the time of the accident and the testimony of witnesses that these doors were open after the accident and were always wide open was not necessarily in conflict with Moran's testimony that there was no light being reflected through them at the moment of the accident. At any rate *he* could not see and for *him* it was not prudent to advance when he knew of another perfectly safe entrance. A number of witnesses were examined in regard to the purposes for which the rear entrance was used, but this testimony has no important bearing upon the conclusion we have reached.

It is sufficient to say it was conceded that Moran had no knowledge of any use of this entrance by the public at any time, and that there is no evidence tending to show that appellant knew of its being used by any class of the public, except tradesmen delivering supplies at the pantry and the elevator, since a time four or five years prior to the accident when carpenters were repairing damages to the rear part of the building occasioned by a fire. The testimony of appellant is that the entrance was used to get the ashes out and also used by the supply men and the ice man and the laundry man, and was not intended for public use.

Nine bills of exception appear in the record, eight to the rulings of the trial Court on evidence, and one to the ruling on the prayers.

It will be necessary for us to consider only the refusal to grant appellant's first and fourth prayers, which were as follows:

*Defendant's First Prayer.*—The defendant prays the Court to instruct the jury that no legally sufficient evidence has

been offered in this case to justify the jury in finding a verdict for the plaintiff and that, therefore, their verdict must be for the defendant.

*Defendant's Fourth Prayer.*—The defendant prays the Court to instruct the jury that from the uncontradicted evidence in the case it appears that the plaintiff was guilty of negligence directly contributing to the accident, and that the verdict of the jury must be for the defendant.

One at least of these prayers should have been granted.

If there was evidence tending to show negligence on the part of the appellant, which we do not decide, defendant's fourth prayer should have been granted. This is a clear case of contributory negligence, assuming there was primary negligence. Moran was certainly not expressly invited or authorized to enter the building by the rear entrance, and there was nothing to justfy him in assuming that it was intended for public use. It led directly, so far as he could see, only to the pantry, a private part of the building. In some unexplained manner he found his way out through the rear door without suggestion on the part of any one; and because it then appeared safe to him, he took the liberty of using it again the next morning, presumably for his own convenience as it was the nearer way. He had no right to take for granted that entrance would be kept safe for him. Indeed, if, on leaving the building the day before, he had observed as closely as one should who is exploring strange paths he would have seen, posted on the pantry wall just above and to the side of the steps he ascended to reach the hall, a notice that "Employees must enter and leave building by front door only." The uncontradicted testimony shows such a notice was there, although Moran says he did not see it. The appearance of the unlighted hall, so dark that he could not find the entrance to the pantry through which he had passed the day before in leaving the building—so dark, indeed, that he was not sure he could see his hand in front of his face—was sufficient warning of danger to have turned back a prudent man. Under such conditions he advanced at his own risk and must

be held to have been responsible for the accident which befell
him.   *Tkac* v. *Md. Steel Co.,* 101 Md. 179; *Linton* v. *Bal-
timore Mfg. Co.,* 109 Md. 404; *Rooney* v. *Woolworth,* 74
Conn. 720.

The Maryland cases above cited are cases of employees;
but it would seem that even greater care should be required
of strangers using an entrance not intended for public use
and with which they are not familiar.   This requirement is
emphasized in the Connecticut case.

We are not unmindful of the rule announced by this Court
in many cases, that to justify a Court in saying that certain
conduct is *per se* contributory negligence, the case must pre-
sent some such feature of recklessness as would leave no op-
portunity for difference of opinion as to its imprudence in
the minds of ordinarily prudent men; and in the decision we
have reached in this case we do not mean to depart in the
least from that salutary principle.

Another objection urged by appellant is that this suit was
erroneously brought by the employer for the use of the em-
ployee.   But in view of the conclusion we have reached it is
unnecessary to decide that question in this case, especially
as the law in this respect was amended by the last Legislature
and the question raised will not be important in cases arising
out of accidents occurring after that amendment goes into
effect.

It is most unfortunate that Moran abandoned the relief
he was enjoying under the award of the State Accident Com-
mission.

But as he appears to have done this in the honest belief
that he had recovered sufficiently to go back to work, it is
hoped there may be found some way under the law for his
reinstatement to the position he held under that award.

*Judgment reversed without a new trial, with
costs to appellant.*