## LOUIS MORGENSTERN ET AL. *vs.* LOUIS SHEER.

*Negligence—Open Elevator Shaft—Entrance to Building—
Warning Signs—Contributory Negligence—Evidence.*

In an action for injuries received by plaintiff as a result of
falling down an unguarded elevator shaft in defendants' build-
ing, which plaintiff, while seeking the tenant of an upper floor,
had entered by an entrance intended for freight, it was proper
to refuse to direct a verdict for defendants on the ground that
signs posted at such entrance were sufficient to warn plaintiff
that the entrance was for freight only, in view of plaintiff's
evidence that there were no such warning signs at the time of
the accident.                              pp. 216, 217

Plaintiff having entered the building through what he, and
other witnesses unfamiliar with the building, believed to be the
main entrance, he had a right to assume that the way was a
reasonably safe one, and that he would not be exposed to the
danger of an open and unguarded elevator shaft, and the fact
that he fell into the open shaft is not conclusive evidence of
contributory negligence on his part, he having merely followed
the hallway, in which there was light sufficient to enable him
to see ten or twelve feet ahead of him, looking for steps or an
elevator to the upper floors.              pp. 217-219

If one of the two entrances to the building maintained by
defendants was intended as a freight entrance only, was dan-
gerous, and was likely to be mistaken for the proper entrance,
it was their duty to warn persons against its use, and whether
signs to that effect were up at the time of the accident, whether
they were, under the circumstances disclosed by the evidence, a
sufficient warning to a person exercising due care in entering
the building, and whether plaintiff was, under the circum-
stances, negligent in entering through that entrance, were all
questions of fact for the jury.              p. 220

A prayer that if a "no admission" sign was posted at the
entrance, and that the sign "was of such a character as should

have been seen by a reasonable prudent man," then the plaintiff was a trespasser and the verdict should be for the defendants, was properly refused as referring only to the character of the sign, and as taking away from the consideration of the jury its location at the time of the accident, there being evidence that such a sign was posted on one of the doors to the freight entrance, but that the doors, which opened inside, were open at the time.                                    pp. 220, 221

That a witness was examined as to the conditions seen by him on a visit to the premises several days after the accident was rendered harmless as to defendants by their subsequent introduction of evidence that the condition of the building at the place of the accident remained the same for several weeks after the accident.                                    p. 221

In an action for injuries caused by a fall down an elevator shaft, of the location of which, near the entrance to defendant's building, he had no proper warning, *held* that a question asked of a witness for plaintiff as to how close he, witness, was to the shaft when he first saw it, was proper.            p. 221

While the testimony of plaintiff's witness as to the condition of the premises on the occasion of his visit thereto, and that he almost walked into the elevator shaft, was not admissible to show that the accident to plaintiff happened in the manner testified to by the latter, or that it occurred without any fault or negligence on his part, it was admissible as describing the scene of the accident, and to show the dangerous condition of the entrance and hallway by reason of the location of the shaft.
                                    pp. 222, 223

If any part of the answer of a witness is admissible, a motion to strike out the whole answer is properly refused.      p. 222

When evidence is admitted subject to exception, and no motion is subsequently made to strike it out, any objection to its admissibility is waived.                                    p. 223

*Decided February 14th, 1924.*

Appeal from the Baltimore City Court (STUMP, J.).

Action by Louis Sheer against Louis Morgenstern and Nathan Morgenstern, trading as J. Morgenstern & Sons.

From a judgment for plaintiff in the sum of $6,000, defendants appeal.   Affirmed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*J. Stanislaus Cook* and *Walter V. Harrison,* for the appellants.

*Louis S. Ashman* and *J. Kemp Bartlett, Jr.,* with whom was *Bernard E. Stern* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appeal in this case is from a judgment recovered by the appellee against the appellants in the Baltimore City Court for injuries sustained in falling down an elevator shaft in a building belonging to the appellants.

The building is located on the north side of Redwood Street, between Eutaw and Paca Streets, and is known as Nos. 404 and 406 West Redwood Street. It was owned by the appellants, Louis Morgenstern and Nathan Morgenstern, who were engaged in the manufacture of pants under the firm name of J. Morgenstern & Sons, and who occupied the third floor. The other floors of the building were leased by the appellants to various tenants, including Gladstone & Kushner, who were also engaged in making pants, and who occupied the fourth floor.

In approaching the building from Eutaw Street and going west on the north side of Redwood Street, you come first to a small door, about three feet wide, which is reached by two steps up from the pavement and leads to a stairway running to the upper floors. A short distance from, and about two feet west of, the first door, there is a large double door, about five feet wide. This double door opens into a hallway, about on a level with the pavement, which extends north into the building about twelve feet and then turns at right angles to the left or west, and runs a distance of about twelve feet to a partition at the end of the hall. When you enter the build-

ing through the double door, the left side of the hallway is a partition "of a wood slat construction, open, upright slats, about three inches wide, with a space of an inch and a half between them." At the end of this partition there is another partition of like construction which runs west at right angles with the first partition for a distance of about six feet to the elevator shaft, which is five feet nine inches wide, and extends to the west end of the hall.

On the day before the accident, which occurred on the 4th of April, 1922, Mr. Gladstone, of Gladstone & Kushner, asked the plaintiff to work for them and to come to see them at their place of business, and told him that their address was Morgenstern & Sons' building, 404 West Redwood Street. About 12 o'clock the following day the plaintiff, on his way to see Mr. Gladstone, went down Eutaw Street to Redwood Street, and then west on Redwood Street until he came to the building. He saw the name of J. Morgenstern & Sons across the front of the building, and then looked for and saw No. 404 on the building. He observed the small door, but as it was closed he looked for another door and saw the double door, both doors of which were open, and entered the building through that entrance. His description of what occurred after he entered the door is as follows: "As soon as I went in there I saw a partition in front, facing me as I went in. I was walking north to the partition, then on the left side there was another partition. I don't know whether it was a partition or wall there; it reached to the ceiling. You see I did not look at that. I just walked and walked to the end of the partition on my left side. * * * I was looking for the step or an elevator. So when I came to the end of the partition I made a foot or two step and down I went with my left foot right in there; I could not balance, you know, it unbalanced me over, and I could not grab hold of something, and I fell right in. There was no bar or door to keep me, nothing at all. Nothing to grab hold of. * * * It was light from the outside. * * * I could not get north because the partition was facing me, so I turned to my left to look for a step or elevator, and as soon as I stepped a step or two then

I fell right in. * * * When I made the turn it was light, but it was not as light as it was when I first came where the doors were wide open. It was light, but it was not as much as it was as soon as I came in. You could see about ten feet ahead of you there. * * * I could see about ten or twelve feet ahead of me." He further testified that there was no electric light in front of or in the elevator, and that there was no bar, or gate, or door or chain at the opening, and that if there had been a chain there he would have grabbed hold of it; that while he was lying in the cellar he looked up and saw the elevator up at the third or fourth floor. On cross-examination he testified that he did not see any signs at the smaller door; that he looked but did not see any; that when he looked for No. 404, "I saw the wide-open door. When I came to the wide-open door I looked up, and there was no sign"; that he did not see on the door a sign which stated, "positively no admission," and did not see inside a sign which stated "freight entrance only"; that when he entered he continued to walk until he got to the end of the partition on his left, and then he made a turn to the left, and that he could then see ten or twelve feet ahead of him. Police Officer Douglas testified that he was connected with the Western Police Station, and that on April 4th he was sent to Morgenstern & Sons, 404 and 406 West Redwood Street, to investigate the accident; that he reached there between 5 and 6 o'clock that afternoon; that he went up Eutaw Street and turned west on the north side of Redwood Street; that when he got to the building he found both of the double doors wide open and entered the building through that entrance because he took that to be the main entrance; that when he entered the hallway through that entrance he flashed his light and walked north about twelve feet to a partition and then turned to his left and walked about five feet further, when he saw the elevator shaft on his left; that he examined the elevator shaft; that he looked down the elevator shaft and saw a rusty chain hanging down; that he could not tell whether it was a "whole chain or a half chain, but there was no chain across the shaft; the chain was hanging down loosely, and there was

nothing across the opening to keep anybody from falling in
at all"; that he wanted to talk to Mr. Morgenstern, so he
walked out on the street again and looked for some other door
to the building; that he then noticed a small door, which
was closed, and opened it and walked upstairs to the third
floor; that some tailor told him that Mr. Morgenstern was
out and that he did not know anything about the accident,
and that he, witness, then went down to the second floor,
which was occupied by some publishing company; that he
met a Mr. Gladstone and asked him if he knew anything
about the accident, and that he told him that it happened
about 11 o'clock in the morning, and took him down in the
elevator to the first floor; that when he got down there he
flashed his light again, as there was no light in the building,
and found that there was no "safety door" to the elevator
shaft, and no bar or anything across it to prevent a stranger
from falling in, and that he then went back to his district
and made his report. On cross-examination he said that
when he went to the building he did not see the small door
that he afterwards went in, but saw the main door and went
in that way; that he did not see any signs when he went in,
and that after he went in the building through the main
entrance and did not find any way to go upstairs, he went
out on the street again. Dr. Chideckel testified that when
he went to the building some time after the accident to see
Mr. Morgenstern, he went in through the large door men-
tioned by the plaintiff, thinking it was the main entrance;
and that while looking for steps to go to the upper floors he
discovered the elevator shaft, which was open, by getting one
foot in it, and that he then struck a match and found the
stairway in another part of the building near the elevator
shaft and went upstairs. On cross-examination he said:
"When I went in the front entrance there was plenty of light
in there. As I was advancing in the hall it was getting
darker, and all of a sudden I found myself in front of the
elevator shaft. * * * I only know that one of my feet felt
that I had no bottom under me, and all of a sudden I dis-
covered that I was going into an elevator shaft"; that he

grabbed a chain that was hanging down on the side and caught himself, and that when he went in the building he did not see any warning signs. Samuel Becker, another witness for the plaintiff, testified that the night before the accident Mr. Gladstone came to see him and asked him to work for him; that Mr. Gladstone told him to come to 404 West Redwood Street, fourth floor, over Morgenstern & Sons, and that when he went there the next day about 12 o'clock he saw Morgenstern & Sons across the front of the building and went in the building through the wide entrance (the one through which the plaintiff entered), and walked in the hall and turned to the west, but as he did not see any stairs or elevator, he went out of the building and went in the other door and upstairs; that when you enter the building through the wide or main entrance the hall is very light from the light outside, and that when you turn to the left there is less light; that he can read signs, and that he looked for them, and that if there had been any warning signs he would not have gone in through that entrance. On cross-examination he testified that when he turned to the left in the hall it was light enough for him to see where he was going, but that he did not see the elevator shaft because he only stayed in there long enough to discover that there were no steps in there leading to the upper floors of the building. Joseph Jollomb, a tailor, who after the accident went to work for Mr. Gladstone in the place of the plaintiff, testified that when he went there to work some days later, knowing of the accident, he entered the building through the "narrow entrance," but that after he had been working there he and several others went down to the place of the accident and saw that there was a part of a broken, rusty chain hanging there; that the chain would not reach across the opening of the elevator shaft, and that there were no doors to the opening. Mack Dubinsky, another witness for the plaintiff, testified that when he went to the building about three weeks after the accident, to secure work with Gladstone & Kushner, he entered the building through the same entrance the plaintiff used, and that he did not see any signs warning persons not to use that en-

trance, and that there were no such signs there when he went
there. It was admitted that the defendants owned the build-
ing and the elevator; that they and the other occupants of
the building used the elevator, and that the tenants of the
defendants rented from the defendants with the right to use
the elevator. The plaintiff then offered in evidence a volume
of City Ordinances and Resolutions passed in 1908 and
1909, and read to the jury paragraphs 26 and 45 of Ordi-
nance 155, as follows:

"Par. 26. Freight enclosure doors may be made to hinge
or slide up and down, or have semi-automatic gates not less
than five feet high; but where hinged gates are used there
must be also a hinged guard rail inside next to elevator
shaft.

"Par. 45. In all cases the guards or gates of any elevator
shall be kept closed when the elevator is not in actual use,
under penalty of $25.00 fine."

The defendants offered evidence tending to show that the
double door of the building, referred to in the evidence, was
used as a freight entrance, and that on April 4th there was
a sign on the outside of the westernmost of the two doors to
the freight entrance which stated, "No admission. This
means you"; that these doors opened "inwardly," and the
entrance leads to the elevator; that there was also a sign on
the inside, on the west wall or partition, about five feet from
the door, which stated, "This entrance for freight only. No
passengers allowed, J. Morgenstern & Sons," and that these
signs were made by the witness, Rudolph Ott, after he went
to work for Morgenstern & Sons; that they "were marked
with a stencil brush," and placed by him about three years
before the accident; that the elevator was used for freight
by the defendants and other occupants of the building; that
there was no one employed or designated to operate the ele-
vator, and that so far as the witness knew it was never used
"for passengers." On cross-examination the witness testified
that he was employed by Morgenstern & Sons, who occupied
the third floor, as shipping and receiving clerk, and that

when he wanted the elevator he opened a little door to the side of the elevator shaft, where the ropes that operate the elevator are located, and holloed, and if he received no answer he pulled "the thing" that brought the elevator up; that from the third floor he could look down the elevator shaft to the first floor; that he generally holloed two or three times; that when the elevator is brought up it leaves an opening below to the elevator shaft, which had a chain across it; that the chain was made in two sections, which were linked together by a snapper hook; that when the elevator is brought up by a person on the third floor he cannot link the chains together, and if they are not linked when the elevator is raised to the upper floor they remain that way. On redirect examination he said that there was a chain at the elevator shaft on the 4th of April, 1922.

The record contains six exceptions, the first five of which are to rulings of the court below on the evidence, and the sixth is to the granting of the plaintiff's prayer and to the rejection of certain of the defendants' prayers.

The plaintiff's prayer is the usual damage prayer, and no objection to its form was urged in this court. The defendants offered eleven prayers, the third, sixth and eighth of which were granted and the others rejected. Their A., B., and first prayers asked for a directed verdict in favor of the defendants, (1) because of the want of legally sufficient evidence to entitle the plaintiff to recover; (2) because the plaintiff was guilty of contributory negligence, and (3) because the only invitation to the plaintiff to enter the building was an invitation to enter by the "eastermost entrance to said building."

In support of A. prayer the appellants contend that "the posting of the two signs at the freight entrance, warning all who attempted to enter there that the entrance was for freight only, was sufficient compliance by the appellants with the duty imposed upon them," and in support of this contention they rely upon *Zoebisch* v. *Tarbell,* 92 Mass. 385, and *Hyde* v. *Blumenthal,* 136 Md. 445. A careful reading of

those cases will show that they do not go to the extent claimed, but even if they did, that would not have justified the granting of A. prayer, because the plaintiff offered evidence tending to show that there were no such warning signs at the time of the accident, and it was for the jury to determine the issue of fact thus raised.

In reference to their B. prayer, the appellants insist that if, as testified by the plaintiff, there was sufficient light in the hall for him to see ten or twelve feet ahead of him, he could, by the exercise of due care, have seen the open elevator shaft in time to have avoided the accident, and the fact that he walked into the open shaft is conclusive evidence that he did not exercise due care, on the principle stated in *Baltimore Traction Co.* v. *Helms,* 84 Md. 516, and applied in a number of later cases, that "if a witness who can see testifies that he looked and did not see an object, which if he had looked he must have seen—such testimony is unworthy of consideration." The answer to this contention is that the plaintiff having entered the building through what he believed to be the main entrance, he had a right to assume that the way was a reasonably safe one and that he would not be exposed to the danger of an open and unguarded elevator shaft, and the fact that he fell into the open shaft is not conclusive evidence of contributory negligence, but it was for the jury to say whether under the circumstances he contributed to the accident by his own negligence. In *Knight* v. *Baltimore City,* 97 Md. 652, the Court said: "When the facts are undisputed, and but one inference regarding the care of the plaintiff can be drawn from them, the question is one of law for the court. But when the facts are disputed, or more than one inference can be fairly drawn from them as to the care, or want of care, of the plaintiff, the question of contributory negligence is for the jury." The rule in regard to the responsibility of the owner of a building is stated in 20 *R. C. L.* 55 and approved by this Court in *Fulton Building Co.* v. *Stichel,* 135 Md. 545, as follows: "The authorities are entirely agreed upon the proposition that an

owner or occupant of lands or buildings who directly or by implication invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils." And in the same section the author says: "While the rule has been applied in innumerable situations it has been invoked most frequently, perhaps, in the case of injuries from unguarded excavations, unprotected stairways, hatchways, trapdoors, turnstiles, revolving or swinging doors, and collapsing buildings." In the case of *People's Bank* v. *Morgolofski,* 75 Md. 432, where the plaintiff was injured by falling "through the elevator shaft" in the defendant's building, this Court, in affirming the action of the lower court refusing to withdraw the case from the jury on the ground of contributory negligence, after saying that the court will never assume such a responsibility unless the case is a very clear one, and there is "some prominent and decisive act in regard to the effect and character of which no room is left for ordinary minds to differ," said: "The act relied on here to show contributory negligence on the part of the plaintiff is the one established by his own testimony—namely, that he walked into the elevator shaft without looking to see if the elevator was there. He testified that he could not see at all, but that he was sure with the door open and the bar back, the elevator was in its place; and that it was so dark he could not see whether it was there or not. He does not say, he was not asked to say, whether he could see the elevator door was open, and the bar pulled back. The fair inference from his testimony is that he could see that the elevator door was open, but could not see whether the elevator was or was not in its place. He says: 'The door being open, and the bar back,' he was sure the elevator was there." After referring to several authorities, the Court said further: "It was undoubtedly the duty of the defendant to operate the elevator in question with reasonable care and vigilance. * * * And the plaintiff had a right to assume that this duty would be faithfully performed. So assuming, he would not be re-

quired to exercise that degree of caution which could properly and fairly be demanded of him under other circumstances. It is a sound rule of law, says *Beach on Contributory Negligence*, 41, that it is not contributory negligence not to look for danger where there is no reason to apprehend any. This principle is forcibly illustrated and applied in *R. R. Co. v. State, use of Hauer,* 60 Md. 463, and *R. R. Co. v. Anderson,* 72 Md. 523."

It is also urged in reference to this prayer that if, after the plaintiff turned to his left in the hall, he was "unable to see where he was going, then the plaintiff was guilty of negligence in proceeding along his journey in a strange passage," and in support of this view the appellants rely upon the case of *Hyde* v. *Blumenthal, supra,* where JUDGE ADKINS said: "The appearance of the unlighted hall, so dark that he could not find the entrance to the pantry through which he had passed the day before on leaving the building—so dark, indeed, that he was not sure that he could see his hand in front of his face—was sufficient warning of danger to turn back a prudent man. Under such circumstances he advanced at his own risk and must be held to have been responsible for the accident that befell him." The facts of that case were, however, in important particulars, very different from the facts of the present case. There the injured party, instead of entering the building through the entrance intended for the use of the public and with which he was familiar, elected to use an entrance not intended for his use, and with which he was not familiar, and to proceed along a hallway that was so dark that he was not certain he could see his hand before his face. Here the plaintiff entered the building through what he, and other witnesses not familiar with the building, took to be the main entrance, and followed the hallway, in which there was, according to his testimony, sufficient light to enable him to see ten or twelve feet ahead of him, looking for steps or an elevator to the upper floors, until he fell into the unprotected elevator shaft. In regard to the defendants' first prayer it is only necessary to say that the

invitation to the plaintiff was to go to the fourth floor of the building, and there was evidence tending to show that the plaintiff entered the building for the purpose of going to the fourth floor through what he and other witnesses took to be the main entrance. The defendants maintained two entrances, and if one was intended as a freight entrance only, was dangerous and likely to be mistaken for the proper entrance, it was the duty of the defendants to warn persons against its use, and whether the signs mentioned in the evidence were up at the time of the accident; whether they were, under the circumstances disclosed by the evidence, a sufficient warning to a person exercising due care in entering the building; and whether the plaintiff was, under the circumstances, guilty of negligence in entering the building through that entrance, were all questions of fact for the jury to determine.

By their second prayer the defendants asked the court to instruct the jury that, if they found that the plaintiff entered the building through the double door, the defendants were not liable for the injuries he sustained, and is open to the objections indicated in disposing of their first prayer. The defendants' fourth prayer, in so far as it is free from objection, is covered by their third and sixth prayers, which were granted. The defendants' fifth prayer was objectionable because it assumed that the notice, "No admission. This means you," was posted on the door at the time of the accident, which was a question of fact to be left to the jury. Their seventh prayer asked the court to instruct the jury that if they found that the notice, "No admission. This means you," was posted at the entrance, "and that said sign was of such a character as should have been seen by a reasonable prudent man," then the plaintiff was a trespasser and their verdict should be for the defendants. This prayer refers only to the "character" of the sign, and takes away from the consideration of the jury its location at the time of the accident. There was evidence tending to show that such a sign was posted on the outside of one of the doors to the freight

entrance, so that it could be seen as you approach the entrance when the doors were closed, but all of the evidence tends to show that both of these doors, which opened inside, were open at the time of the accident, and whether under such circumstances the sign should have been observed "by a reasonably prudent man," was a matter for the jury to consider, in determining the question of the plaintiff's negligence. The defendants' ninth prayer leaves out of consideration entirely the character of the signs, and whether at the time of the accident they were so located as to be a warning, to a person exercising due care, not to use the entrance.

The defendants' granted prayers instructed the jury as to the care required to be exercised by the plaintiff in entering the building, and the consequence of his failure to exercise that care, and, for the reasons we have stated, there was no reversible error in the rejection of their other prayers.

The first exception, as stated in the record, was to "the examination of the witness as to the conditions found by the witness when he is alleged to have visited the premises several days after the accident." Evidence later introduced by the defendants was to the effect that the condition of the building at the place of the accident remained the same for several weeks after the accident, and the defendants could not therefore have been injured by the evidence objected to, even if it was inadmissible at the time it was offered.

The second exception was to the question to the plaintiff's witness: "How close were you to the elevator shaft when you first saw it?" In answer to the question the witness said: "Well, I was close enough to have one foot in the pit." The question was not objectionable, and no motion was made to strike out the answer. The same witness, in answer to the question: "What were you doing when you first saw it (the elevator shaft)?" said, "When I was looking for the step and could not find it, I walked into another part of the hall and I almost walked into the elevator shaft. It was open." The defendants moved to strike out this answer of the witness, and the court struck out that part of the answer which

stated that the elevator shaft was open, and the third excep-
tion is to the refusal of the court to strike out the balance.
It is not contended that all of that part of the answer which
the court refused to strike out was inadmissible, and the part
specially referred to in the exception is the statement that
the witness "almost walked into the elevator shaft." The
motion, however, was to strike out all of the answer, and if
any part of it was admissible, the defendants have no ground
to complain of the court's refusal to grant the motion. But
apart from this view, while the evidence referred to was not
admissible, under the rule stated in *Wise* v. *Ackerman,* 76
Md. 375, for the purpose of showing that the accident to the
plaintiff happened in the manner testified to by him, or that
it occurred without any fault or negligence of the plaintiff,
it was admissible, we think, as describing the scene of the
accident and for the purpose of showing the dangerous con-
dition of the entrance and hallway by reason of the location
of the elevator shaft. In *Cordish* v. *Bloom,* 138 Md. 81,
CHIEF JUDGE BOYD, after quoting the statement in *District
of Columbia* v. *Armes,* 107 U. S. 519 : "The frequency of
accidents at a particular place would seem to be good evi-
dence of its dangerous character,—at least it is some evi-
dence to that effect," and the statement in *Kankakee* v.
*Phipps,* 135 Ill. App. 585 : "Evidence of similar accidents
from the same cause is competent, not for the purpose of
showing independent acts of negligence, but as tending to
show that the common cause of the accidents is a dangerous,
unsafe thing," then said: "Indeed as in this case the defend-
ants contend, as they do in this Court, that it was impossi-
ble for the accident to have happened as the plaintiff said it
did, it would seem to be very pertinent evidence to show
that others were injured in the same way, and that could be
done without conflicting with what was said in *Wise* v. *Ack-
erman."* We do not deem it necessary, however, to decide
whether the decision in *Cordish* v. *Bloom* is applicable to
the evidence referred to in this exception, for, as already
stated, we think it, like the answer to the previous question,

was admissible, not as evidence of a similar accident, for no accident happened to the witness, but as describing the scene of the accident, and for the purpose of showing the dangerous condition of the entrance.

The fourth exception was premature. The evidence objected to had not been offered or admitted, and when later on the witness volunteered the evidence objected to, counsel for the plaintiff consented to its being stricken out and told the jury not to consider it. The fifth exception was to the reading to the jury of the two sections of the city ordinance to which we have referred. The ground of the exception, as stated in the appellants' brief, is that the entire ordinance should have been offered in evidence. The plaintiff produced the ordinance, and if the defendants had objected to the evidence in the court below on the ground stated, their objection would doubtless have been obviated by offering the entire ordinance in evidence. But the evidence was admitted, the record shows, subject to exception, and as no motion was made to strike it out, the defendants must be held to have waived or abandoned their objection to its admissibility.

Finding no reversible error in any of the rulings of the court below, the judgment will be affirmed.

*Judgment affirmed, with costs.*