## TWOMBLEY *v.* FULLER BRUSH COMPANY

[No. 112, September Term, 1959.]

478

*Decided February 18, 1960.*

480

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Edward C. Donahue,* with whom were *William A. Ehrmantraut* and *Donahue & Ehrmantraut,* on the brief, for the appellant.

*Joseph B. Simpson, Jr.,* with whom were *Vivian V. Simpson, H. Algire McFaul* and *Simpson & Simpson,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellant, Twombley, brought suit for damages arising from illness (hepatitis) alleged to have been caused by his use of a spot remover manufactured and sold by the defendant, Fuller Brush Company. One count of the declaration was based upon breach of an implied warranty, the other upon negligence. The trial judge directed a verdict in favor of the defendant at the conclusion of the plaintiff's case, and the plaintiff appeals from the judgment entered thereon.

The principal questions in the case concern causation, breach of warranty and negligence. Proof of causation is, of course, necessary as a foundation for liability on either theory. This question turns on whether the defendant's spot remover was identified with sufficient definiteness as the cause of the plaintiff's contracting hepatitis, or whether it was impossible to choose, otherwise than as a matter of speculation, between the cause for which the defendant was (or might be) responsible and other possible causes, for none of which the defendant was responsible. The trial judge was of the opinion that such a choice would be a matter of mere speculation and granted the motion for a directed verdict on that basis. The other questions, though presented, were not passed upon.

Whether or not the evidence was sufficiently definite to show that the defendant's product caused the plaintiff's illness depends largely upon the testimony of the expert witnesses called by the plaintiff and upon medical or hospital records. Some rather detailed examination of the evidence seems necessary.

In May, 1957, a door to door salesman for the defendant called at the plaintiff's home, showed the plaintiff's wife some merchandise, including a can of spot remover, told her that it did a good job and sold her a can of it. This spot remover was sold in a pressurized can. It was not used until the 4th of July, 1957. At or shortly after noon on that day the plaintiff used it first to clean some spots off a pair of pants, and then he was so pleased with the result that he used the spot remover to clean the entire garment. He used an ironing board for the cleaning job and then used it to press the pants with an electric steam iron. He did the cleaning and ironing on a porch which had a wall of the house on one side and was screened on the other three. In doing the cleaning Twombley sprayed the cleaner over the trousers in short spurts at about the height of his chest, and he said that as a result of spraying the pants some mist bounced off them and that it had an odor and felt cool. There was also a considerable odor later while he was using the steam iron, which he said made the place smell like a cleaning establishment. The entire operation took about an hour or an hour and a half.

Twombley says that he read the instructions on the can and followed them in his cleaning operation. The pertinent parts of the instructions were as follows:

> "Remove metal cap. Press down plastic button, with hole away from you. Avoid wetting fingers with spray, as contact with propellant can cause frostbite. * * * Holding can upright, six to eight inches away from the fabric spray the area to be cleaned, using a circular motion. Gently sponge the area sprayed with clean white cloth. * * *
> Caution: Never puncture container or throw into fire when empty. Do not store above one hundred and twenty degrees fahrenheit, near stove, radiator or other source of heat. Use in well ventilated place. Avoid excessive inhalation."

During the afternoon following the cleaning and ironing job, Twombley felt some nausea, but he and his wife went to a buffet supper to which they had previously been invited.

While at the party he drank from three to five gin and tonics and ate a hearty meal. On returning home he felt pains in his chest, which he thought were due to indigestion, and he took remedies for that. The following day he made some business calls (he operates a tree surgeon service), but he could not eat and the pains continued. He noticed that his urine was very dark and getting darker. He described it as the color of dark coffee. On July 7, the pains were so severe that he went to see his doctor. His regular family physician, Dr. Saverese was away, but Twombley saw Dr. Savarese's associate, Dr. Ehrmantraut, who sent Twombley to the Suburban Hospital at once.

At the hospital the examining physician, Dr. Canivel, took a statement from Twombley in which Twombley said that his condition had begun about a week prior to his admission, "when the patient noticed that his urine was highly colored," and that there was no history of exposure (presumably to hepatitis). Twombley had given blood to the Red Cross blood bank in April, 1957. Dr. Canivel's impressions were first, homologous serum hepatitis, and second, infectious hepatitis. The next day Dr. Canivel's impression recorded evidence of jaundice and of liver parenchymal damage, which "could result from a hepatitis or active phase of a cirrhosis."

On July 7, 1957, Dr. Ehrmantraut made notes in the hospital records more or less similar to Dr. Canivel's, including a statement that the patient "in retrospect noted d[ar]k colored urine at intervals since Tuesday, (7/2/57)." The past history included the giving of a transfusion on April 11, 1957, and that the patient had been given an injection of penicillin for a cold on July 1, 1957. It also stated: "Used cleaning fluid 1 wk. p.t.a.. [prior to admission] No contact c toxic suspected or known inf. hepat." Dr. Ehrmantraut's impression was (1) homologous serum hepatitis and (2) infectious hepatitis, and he ruled out other etiologic or hepatoxic drugs. On July 8, 1957, Dr. Ehrmantraut reported to the Health Department that Twombley had infectious hepatitis. This was not revised later.

On July 10, Dr. Savarese saw Twombley. He had not examined the admission record, but on July 11 he noted in the records that the patient "tells history of cleaning pants with

special Fuller Brush Co. Cleaner." He added "Will have wife bring this in." The can was produced. Dr. Savarese at first thought that the cleaner contained carbon tetrachloride and so noted on the hospital records on July 14. The next day he learned from the defendant that the cleaner contained three compounds, none of which was carbon tetrachloride. Of these three, one was perchloroethylene, which is another name (a trade name) for tetrachloroethylene. Both carbon tetrachloride and tetrachloroethylene are chlorine hydrocarbons, and both are stated to be toxic, but the former is highly toxic and the latter is "down the list towards the bottom" as to toxicity.

Upon learning of Twombley's use of the spot remover, Dr. Savarese thought that the plaintiff's illness might be toxic hepatitis. On July 15, the day on which he learned of the ingredients in the defendant's spot remover, he made a note of his impression that the "pattern is compatible with hepatitis, either toxic or infectious, or the active phase of cirrhosis." On July 21, Dr. Ehrmantraut noted that "Persistence belies usual inf. [infectious] hepatitis course of this mild a nature. Could this be actually due to hepatoxic drugs as suggested by Dr. S. or aggravated by same." The next day he made a further note referring to "the new clinical history of possible carbon tetrachloride or cl. [chlorine] hydrocarbons poisoning * * *." On July 24, he noted: "This is hepatocellular damage of unknown etiology [cause]. History of case of spot remover incriminates this as well as other causes. Have not checked on its toxic effects as yet." On July 28, 1957, the date of Twombley's discharge from the hospital, Dr. Ehrmantraut wrote: "Final diagnosis must be hepatitis of unknown etiology could be toxic, viral or both."

The plaintiff's observed symptoms at and following his admission to the hospital might have been due to any of several causes, as the various and rather tentative "impressions" of the physicians show. Without going into details, or further details, of the medical testimony with regard to two of them—cirrhosis of the liver and infectious hepatitis—we think that this testimony was sufficient to eliminate these as probable causes of the plaintiff's illness and we do not understand the

defendant to press strongly any contrary contention. A closer and more difficult question remains with regard to homologous serum hepatitis which was the other alternative diagnosis to toxic hepatitis.

Dr. Savarese testified that the "pattern" of homologous serum hepatitis and of toxic hepatitis, and of infectious hepatitis, too, would be the same. He was then apparently speaking of symptoms. He also said that if a person has a homologous serum jaundice the course would be different, but that there was no way of specifically ruling it out entirely, short of taking a biopsy of the liver. A number of hepatograms were made at the hospital, but no biopsy was taken. Both serum hepatitis and infectious hepatitis are viral, though they are caused by different viruses.

A frequent cause of serum hepatitis is a puncture of the skin. The development of the plaintiff's illness was within the "perfect period" for the incubation of homologous serum hepatitis after the plaintiff's giving of blood on April 11, 1957. That, of course, involved the puncture of the skin.

In May, 1958, Dr. Savarese gave to the plaintiff's counsel a "[f]inal diagnosis of hepatitis; etiology undetermined; probably toxic." At the trial he gave his opinion as follows: "On the basis of my examination, the history, the laboratory tests, it is my opinion that Mr. Twombley is suffering from permanent liver damage, caused by a toxic substance and according to the history and all the information I have this toxic substance was in the form of a spot remover in a spray type preparation." Able and vigorous cross-examination did not shake him from this opinion. He was asked specifically how he ruled out homologous serum hepatitis. His answers were, in substance, that he did so because of learning that the defendant's spray type spot remover used by Twombley contained a toxic type of material and because the course of a homologous serum jaundice would be different, and finally, in his own mind, because he learned on the morning of the trial through a telephone call to the Red Cross that between 1950 and 1957 Mr. Twombley had given fifteen pints of blood. The diagnosis to which he adhered was expressed in terms of probability.

Dr. Wolfgang von Oettingen, the holder of a Ph.D. in chemistry and allied subjects from the University of Gottingen and of an M.D. from the University of Heidelberg, though not a practising physician, is a toxicologist of wide experience, whose qualifications as an expert appear ample. He testified to some of the facts already stated. He described perchloroethylene (tetrachloroethylene) and its toxic effects quite fully. It produces a toxic effect on the liver and causes malaise and extraordinary intestinal disturbances. Its vapors are absorbed through the lungs, very little if any through the skin, and its toxic effects are increased by the ingestion of alcohol and are greater in obese persons than in thin ones. (The plaintiff was somewhat obese, and he consumed a considerable quantity of alcohol on the day of using the cleaner.) The toxicity effect on the liver is markedly increased by alcohol, and this holds true for all chlorine hydrocarbons.

Dr. von Oettingen described tetrachloroethylene as presenting very little danger when used as a cleaner in its ordinary liquid form. He considered exposure to a spray of tetrachloroethylene more harmful than an exposure to the vapors, "because a spray consists of fine droplets, whereas vapor is gaseous material, and the droplets, which are tiny amounts of liquid material, are inhaled and penetrate into the lung tissue. Because of their high boiling point they evaporate very slowly; because of their high specific gravity they have a tendency to stay in the deeper sections of the lung." It would be more hazardous where used as a "spray or mist" than in liquid form. He knew of no reported case of jaundice caused by perchloroethylene at the time when he wrote the last edition of his book, published in 1958 and written over the period from 1955 to 1958, entitled "Poisoning Guide to Clinical Diagnosis and Treatment."

Dr. von Oettingen testified that he had been present in court and had heard all of the testimony, which included that of the plaintiff, of the plaintiff's wife and of Dr. Savarese. The evidence also included the clinical records. Over objection he testified: "It is my opinion that on the basis of the clinical evidence presented today, which shows without doubt that Mr. Twombley is suffering from hepatitis—that this

hepatitis is of toxic origin, due to the exposure to a cloud of droplets of tetrachloroethylene." On cross-examination he adhered to this view, notwithstanding the fact that the clinical records showed that Twombley had said he had noticed that his urine was dark in color two days before the date on which he used the cleaner. He thought that in view of the testimony that Twombley was feeling ill and dizzy on the day when he made that statement "too much weight" could not be put on this one statement. He also noted that the plaintiff described the color as darker after he had used the cleaner.

We do not think that the clinical records and the testimony of the witnesses who preceded Dr. von Oettingen on the stand show such internal contradictions as to destroy the basis for his expressing an opinion. The varied and varying impressions of the doctors recorded in the hospital records were not, we think, the clinical facts or observations upon which Dr. von Oettingen based his opinion. We think that the question should have been so expressed as to make this clear in view of such cases as *Mt. Royal Cab Co. v. Dolan,* 168 Md. 633, 171 A. 854, and *Quimby v. Greenhawk,* 166 Md. 335, 171 A. 59. It is well established in this State that an expert may express an opinion upon facts which he has heard or read, upon the assumption that these facts are true. *Thompson v. Standard Wholesale Phosphate & Acid Works, Inc.,* 178 Md. 305, 318-319, 13 A. 2d 328, and cases cited. We find no actual contradictions as to facts in the clinical observations and the testimony of Dr. Savarese as to the plaintiff's symptoms, though the relative weight to be accorded to one fact or observation or another may be open to divergent opinions.

The defendant lays emphasis on the statements in the case history to the effect that Twombley had noticed discoloration in his urine two days before he used the defendant's cleaner, and contends that this is strong evidence that the plaintiff's condition was not caused by the use of the defendant's product. So it may be, but we do not think that the present record would warrant the conclusion that it constituted irrefutable proof that it was not so caused, nor do we understand that the defendant's contention goes that far. Neither do we find any expert testimony in the record extract that goes so far,

and we think the implication of such testimony is to the contrary. Thus, Dr. Savarese was familiar with the plaintiff's medical history, yet he adhered to his final diagnosis that the plaintiff's illness was probably due to toxic hepatitis. Likewise, Dr. von Oettingen , though strongly pressed on this matter on cross-examination, adhered to his view that the plaintiff's illness was of toxic origin. He thought there was "no definite evidence of any of the other possibilities." [1]

In these circumstances we do not think that it is shown that there was such a conflict as to facts as to make Dr. von Oettingen's testimony inadmissible under the rule stated in *Thompson v. Standard Wholesale Phosphate & Acid Works, Inc., supra,* that an expert's opinion based upon assumed facts cannot be based upon conflicting testimony as to the facts. We do not believe that this rule goes so far as to say that an expert may not express an opinion where some fact or facts may point to one conclusion and another or others point to an opposite conclusion. If such were the rule, the use of expert testimony based upon the evaluation of a number of facts would be severely, and we think too much, restricted. The facts upon which Dr. von Oettingen based his opinion were, we think, such as to "permit reasonably accurate conclusions, as distinguished from mere guess or conjecture," (*Marshall v. Sellers,* 188 Md. 508, 519, 53 A. 2d 5, in which this test was stated but was held not to have been met), notwithstanding that this particular item of discoloration and possibly one or two others may have militated against his conclusion. That would seem to be a question for the jury to consider in weighing his overall opinion. *Marshall v. Sellers, supra,* 188 Md. at 518.

Likewise, we do not think that on the record as it stands,

---

1. Dr. von Oettingen discounted the statement as to discoloration before July 4 partly because of the plaintiff's claim that it had then been less marked than after the use of the cleaner, and partly because the doctor doubted the accuracy of the plaintiff's recollection as to the date of its first appearance at the time when he gave his medical histories, since the plaintiff then felt ill and dizzy. The plaintiff's testimony at the trial, however, seems to confirm the medical histories on this point.

we can say that the evidence with regard to discoloration on July 2, or any other testimony destroys any rational basis for the conclusion of the expert witnesses that the plaintiff's illness was toxic in origin and was probably caused by his use of the defendant's cleaner on July 4. On the contrary, we think that their testimony, particularly that of Dr. von Oettingen with regard to the dangers upon the inhalation of perchloroethylene in mist form, was plainly sufficient to show a rational basis for their conclusions.

The fact that the plaintiff's expert witnesses were not absolutely positive in their opinions is not fatal to the plaintiff's case. Reasonable probability or reasonable certainty as to the cause of his illness is sufficient. *Langenfelder v. Thompson,* 179 Md. 502, 20 A. 2d 491; *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse,* 187 Md. 375, 50 A. 2d 256; *Charlton Bros. Transp. Co. v. Garrettson,* 188 Md. 85, 51 A. 2d 642; *Armour & Co. v. Leasure,* 177 Md. 393, 9 A. 2d 572; *Coastal Tank Lines, Inc. v. Canoles,* 207 Md. 37, 45, 113 A. 2d 82; *Baughman Co. v. Mellott,* 216 Md. 278, 283, 139 A. 2d 852. The opinions of Drs. Savarese and von Oettingen were much more positive than the medical opinion expressed in *Ager v. Baltimore Transit Co.,* 213 Md. 414, 132 A. 2d 469. There a statement by a doctor that a certain type of injury "could not be ruled out" was held insufficient to show that it existed or, if it did exist, to show that it was caused by a collision in which the defendant's vehicle was involved. The rule that reasonable probability or reasonable certainty is sufficient was expressly recognized. (213 Md. at 421.) We think that the evidence on behalf of the plaintiff met this test and that it afforded a sufficient basis to enable a jury to find that toxic hepatitis due to using the defendant's cleaner was the cause of the plaintiff's illness.

The next question is whether there is any legal basis upon which the defendant can be held liable for damages due to the plaintiff's illness. As stated above, the plaintiff's claim was based on two grounds: one, an implied warranty of fitness; and the other, negligence for failure to warn of possible dangers from the use of the product. The close relationship between these two possible bases of liability in a case such as

this is clearly brought out by Prosser, *Torts* (2nd Ed.) §§ 83, 84.   Cf. *Bryer v. Rath Packing Co.,* 221 Md. 105, 156 A. 2d 442.

The scope of an implied warranty of fitness has been limited by the common law and the Uniform Sales Act. The latter has been adopted in Maryland, and is contained in Code (1957), Art. 83, Secs. 19-96.   Sec. 33 provides in part:

> "Subject to the provisions of this subtitle and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:
>
> (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.
>
> (2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.
>
> * * *
>
> (4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

The defendant argues that the spot remover was sold, under a trade name and, therefore, Sec. 33 (4) absolves it of any liability for injuries suffered by the user of the article, citing *May Oil Burner Corp. v. Munger,* 159 Md. 605, 152 A. 352, and *Hubbard Fertilizer Co. v. American Trona Corp.,* 142 Md. 246, 120 A. 522.   The plaintiff claims that his wife impliedly informed the Fuller Brush salesman of the purpose for which she bought the product by the mere fact that she bought the spot remover, and that she relied upon the skill and judg-

ment of the salesman who sold her the product and that, therefore, an implied warranty as to the fitness of the product did arise. We are of the opinion that the testimony of Mrs. Twombley relating to the purchase of the spot remover, none of which was disputed by the defendant, permits the inference that Mrs. Twombley relied solely upon the skill and judgment of the salesman when she bought the spot remover. The conversation resulting in the sale indicates that she was unfamiliar with the product and bought it on the salesman's statement that it would do a good job. See 46 Am. Jur., *Sales* § 353, 77 C.J.S., *Sales* § 325 c.

It is not disputed that Mrs. Twombley purchased the cleaner as a household necessity and that she was the agent of Mr. Twombley in so doing and that privity of contract exists between him and the defendant. *Vaccarino v. Cozzubo,* 181 Md. 614, 31 A. 2d 316.

Even if Mrs. Twombley had bought the product under its trade name without relying on the skill and judgment of the salesman, the defendant might still be subject to liability on the ground that the product it manufactured and distributed was not fit for the general purposes for which the product was sold, in this case the removal of spots. Sec. 33 of Art. 83 refers only to implied warranties of quality or fitness for any *particular* purpose. However, the authorities are in agreement that this does not preclude an implied warranty of fitness for the *general* purposes for which the product is sold. See Annotation, Implied warranty of fitness on sale of article by trademark, trade name, or other particular description, 59 A.L.R. 1180; 46 Am. Jur., *Sales* §§ 344, 351; 1 Williston, *Sales* § 236 A (Rev. Ed.); Prosser, *The Implied Warranty of Merchantable Quality,* 27 Minn. L. Rev. 117. Both the *May Oil Burner* case, *supra,* and the *Hubbard Fertilizer* case, *supra,* dealt with claims that the product did not fulfill the specific purpose for which the product was purchased and thus are not applicable here. In the instant case the plaintiff did not allege that the spot remover was not fit because it failed to clean some particular type of spot, but that in its general use as a spot remover it caused serious injury to the user.

Closely analogous to the present situation is *Pietrus v. J. R. Watkins Co.,* 229 Minn. 179, 38 N. W. 2d 799. That case involved an action for damages for breach of implied warranty that a shampoo manufactured and sold by the defendant to the plaintiff was fit for use as a shampoo. The plaintiff introduced evidence that after using the shampoo her hair fell out. The evidence also showed that the shampoo had a very high alkali content and that an agency of the U. S. Government had ordered the defendant not to sell the product. The court held that (229 Minn. at 183) "[t]he label thereon indicated that its intended use was as a hair shampoo. Implied therein was a warranty that for such purposes it was suitable and fit."

In *Frank R. Jelleff, Inc. v. Braden,* 233 F. 2d 671 (D. C. Cir.) the seller of a housecoat was held liable for personal injuries when the housecoat worn by the plaintiff burst into flames when it touched a kitchen stove. Because of the type of garment involved it was held that there was an implied warranty that it was safe for use in housework and that the jury could find the garment was not reasonably fit since it was made of a highly flammable material.

We are of the opinion that the evidence in this case was sufficient to entitle the plaintiff to have a jury pass on the issue of whether or not there was an implied warranty of fitness for the general purpose for which the article was sold and a breach thereof by the defendant.

The defendant answers the plaintiff's second count, alleging failure to adequately warn of the possible dangers involved in using the product, by arguing that since the plaintiff concedes that the toxic substance in the spot remover was not inherently dangerous in its liquid form and the plaintiff did not show that putting it in a spray form made it inherently dangerous, no warning was necessary, particularly in view of the known toxic qualities of cleaning fluids. The plaintiff argues that the testimony of Dr. von Oettingen describing how the qualities of tetrachloroethylene make it more dangerous when put in a spray was enough to show that the product became inherently dangerous when so packaged.

The evidence, we think, shows that chlorine hydrocarbons

are toxic in varying degrees, tetrachloroethylene (perchloro-ethylene) being relatively far down the list as to toxicity and carbon tetrachloride being highly toxic. In its usual liquid state, tetrachloroethylene offers relatively little danger; in mist form, if inhaled, according to Dr. von Oettingen, it is much more dangerous. Both products are used as cleaning fluids and their properties are presumably known in the trade. The direction to use in a well ventilated place and the warning against "excessive inhalation" which the defendant did put on the can, indicates its knowledge of some danger. The use of tetrachloroethylene under pressure as a spray cleaner appears to be something new. Since its possible toxic effects were known, we think that the defendant either was chargeable with notice of its possibly much more dangerous character when used in a spray, or was at least under a duty to make adequate tests before putting it on sale to the public.

In either event, *Restatement, Torts,* § 388 is applicable. That section reads as follows:

> "One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

This section was quoted and followed in *Kaplan v. Stein,* 198 Md. 414, 84 A. 2d 81, a case involving a used automobile with defective brakes. See also 46 Am. Jur., *Sales* §§ 806, 814; Prosser, *Torts* (2nd Ed.), § 83; Dillard & Hart, *Product Liability: Directions for Use and the Duty to Warn,* 41 Va.

L. Rev. 145. As was said in the article last cited, p. 159, "In cases involving *new* products, it is thus clear that a duty to warn will depend on the extent to which knowledge of the danger should reasonably be attributed to the manufacturer. If the product is launched prior to 'adequate' testing, to attribute knowledge would seem reasonable."

Liability has been imposed in cases involving cleaners containing large quantities of carbon tetrachloride sold without adequate warning of danger in *Maize v. Atlantic Refining Co.,* 352 Pa. 51, 41 A. 2d 850, and in *Tampa Drug Co. v. Wait,* 103 So. 2d 603 (Fla.). See also *Hopkins v. E. I. Du Pont de Nemours & Co.,* 199 F. 2d 930 (C. A. 3rd Cir.) ; *Gall v. Union Ice Co.,* 108 Cal. App. 2d 303, 239 P. 2d 48; *McClanahan v. California Spray-Chemical Corp.,* 194 Va. 842, 75 S. E. 2d 712.

A similar question was presented in this Court in *Katz v. Arundel-Brooks Concrete Corp.,* 220 Md. 200, 151 A. 2d 731. In that case, judgment for the supplier was affirmed because of the general public knowledge of the caustic qualities of cement. There was, therefore, no duty on the part of the seller to warn of such dangers. Judge Henderson reviewed the authorities on the general subject. In denying recovery on the ground stated he said (220 Md. at 204) : "If the danger is not patent, it is at least in the realm of common knowledge which the supplier may properly take for granted." There is no showing here of any such public knowledge, and it seems to be negatived by Dr. von Oettingen's testimony.

In the *Katz v. Arundel* case, the rule which we think is here applicable was thus stated by Judge Henderson (220 Md. at 204) : "The authorities cited indicate that the test is one of reasonableness under the circumstances; that a supplier is under a duty to make his product reasonably safe for its intended use with ordinary care; but a duty to warn of inherent dangers only arises where there is a reasonable probability of injury unless warning is given. Most of the cases in which liability has been found are cases where there was a serious defect in the commodity supplied, or where the commodity

was so new that its dangerous properties could not reasonably be known or ascertained by the user."

The latter seems to be the situation here. Whether or not the defendant knew or ought to have known that its spot remover was likely to be dangerous when put to its intended use (*Babylon v. Scruton,* 215 Md. 299, 305, 138 A. 2d 375) and whether or not the warning of danger was adequate (cf. *Morgenstern v. Sheer,* 145 Md. 208, 220, 125 A. 790) were issues which should have been submitted to the jury.

For the above reasons the judgment of the lower court will be reversed and the case remanded for a new trial.

*Judgment reversed and case remanded for a new trial, the costs of this appeal to be paid by the appellee.*