# HUTZLER BROTHERS COMPANY
## *v.* TAYLOR, ET UX.

[No. 396, September Term, 1966.]

*Decided June 27, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*Edward C. Mackie,* with whom were *Rollins, Smalkin, Weston & Andrew* on the brief, for appellant.

*Francis N. Iglehart* with whom were *Brune, Robertson & Iglehart* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Our determination of this appeal will depend, for the most part, on whether we agree with the trial judge's holding that Mrs. Rebecca Timbres Taylor, when she fell and injured herself on the property of appellant (Hutzlers) in Towson, was an invitee rather than a licensee. The jury rendered a verdict of $7,000 in her favor and a verdict of $3,000 in favor of her husband, Richard R. Taylor. From the ensuing judgments Hutzlers has appealed. The facts, with minor exceptions, are undisputed. An occasional glance at the plat made a part of this opinion will make our recital of the facts easier to comprehend.

In 1949 Hutzlers owned the property at the southeast corner of Joppa Road and Dulaney Valley Road. It is designated "X" on the plat. Additionally, it held under long term leases the 20 acre tract, owned by Goucher College, consituting the balance of the land shown on the plat. On 17 August 1949 Hutzlers, Goucher College, Baltimore County and the State Roads Commission entered into an elaborate agreement, the substance of which, as far as we are concerned here, is as follows:

1. Hutzlers agreed to build a department store on its property and to develop the Goucher property as a regional shopping center with a number of individual stores and a common parking lot.
2. Baltimore County and the State Roads Commission agreed to allow Hutzlers to use the space under Joppa Road as

a part of its store so that pedestrians could "freely move from the proposed parking lot on the Goucher property to the basement of Hutzlers' property and vice versa, and thereby avoid crossing Joppa Road."

3. Hutzlers agreed to build a bridge to support Joppa Road so as to make possible the proposed use.

4. Hutzlers stated its intention to develop its property and the "Goucher property into stores and a shopping center" to be known as "Towson Plaza."

5. Hutzlers agreed to maintain certain areas, including the place where this accident occurred.

Mrs. Taylor fell at the top of the stairway (S on the plat) at the corner of Joppa and Dulaney Valley Roads. The stairway had been installed to provide access from the parking area up to Dulaney Valley Road. Samuel Berryhill, Hutzlers' maintenance supervisor for all suburban stores, testified that there once "was some discussion about putting a chain across that stairway and keeping pedestrians from using it." This was discouraged by the man who was store manager at that time. His reason was that "people had to get down to the Plaza and it would be usable for them." The present store manager, asked if he objected to the use of the stairway by persons who had been shopping at Towson Plaza, rather than Hutzlers, replied, "We exercise no restrictions [as] to that, sir." In respect of any objection based on mercantile policy he said, "We all cater to the public, Mr. Iglehart."

Albert Hutzler, Jr., at the time of trial, had been president of the company for about 12 years. In 1949 he was secretary. The primary reason for the stairway, he testified, was to enable people to get back to their cars on the parking lot when the store was closed. He stated that under the 1949 agreement with Goucher College "there can be nothing to impede customers from going between" Hutzlers and the shopping center. While the parking lot is for the benefit of Hutzlers' customers he conceded that the store "cannot control the movement of every customer and [we] don't want to, but we want to keep the parking lot *as much as possible* for" Hutzlers' customers. (Emphasis supplied.) Some time after the opening of the store in 1952, Hutzlers added to the parking facilities by constructing an ele-

vated parking deck (A B C D on the plat) over a part of the original parking area. One gains vehicular access to it from the lower level by means of a ramp. To reach Dulaney Valley Road, after parking on the elevated deck, it is necessary first to descend to the lower level and then climb the stairway (S on the plat).

Hutzlers' lower level parking area, in addition to the area under the elevated parking deck, is indicated on the plat by the letters E F G H J C. This area is maintained by Hutzlers. The balance is leased to Towson Plaza and is maintained by it. It will be observed that point G is but a few feet from the shopping center. There is no visible demarcation between Hutzlers' area and the Towson Plaza area, unless "J" Road may be taken to be a dividing line. The entrance to the parking area from Dulaney Valley Road (J on the plat) is a 4 lane road ("J" Road). Mr. Berryhill agreed, as is obvious from the plat, that one entering at "J" and intending to shop at Towson Plaza would be on Hutzlers' property whether he turned to the left or to the right to park unless, of course, all spaces were occupied, in which case the Towson Plaza area would have to be used.

On 13 August 1964 Mrs. Taylor was a 68 year old, 186 pound, twice-widowed former nurse who had been married to her present husband for about 2 years. A resident of Towson, she had been in England during July. Upon her return she went to Westminster, Maryland for a few days to attend a Quaker meeting. Around 11:00 A.M. she and her neighbor, Mrs. Wicks, set out for the shopping center in Mrs. Taylor's car. She let Mrs. Wicks out near the Hutzlers corner so she could go to a bank nearby. She was to meet Mrs. Taylor at an optician's office a few blocks further down the street. Mrs. Taylor, unable to find a place to park near the optician's office, drove to the Towson Plaza parking lot. She parked her car on the upper level, descended the steps to the lower level, and then ascended the stairway (S on the plat) leading to Dulaney Valley Road. At the top of the stairway she stepped into a depression, turned her ankle and fell.

Both Mrs. Taylor and Mrs. Wicks were regular customers of Hutzlers. Both had charge plates. Mrs. Wicks said it was "one

of her favorite spots," and that she did most of her shopping there. She and Mrs. Taylor shopped together "quite frequently," at least once a week, sometimes twice a week. It was their intention, after leaving the optician's office, to "do a little grocery shopping." Mrs. Taylor wanted to go to the Food Fair (O on the plat). Mrs. Wicks preferred to shop for her groceries at the Acme about 3 to 4 blocks distant from Towson Plaza. Mrs. Wicks said she and Mrs. Taylor often went to Hutzlers for lunch. When they "were in the neighborhood" they would "go in Hutzlers and see what they had." Mostly they looked at dresses. If Mrs. Taylor had not been injured *"most likely [they] would have gone into the store."* (Emphasis supplied.) Mrs. Taylor said she shopped in Hutzlers about "twice a week." She was "always looking for wedding presents" and "always looking in the art department and at dresses." Whenever she wanted to go from the lower level to Dulaney Valley Road she usually went into the store and used the escalator. She recalled using the stairway "three or four times." When she had done so was not made clear.

There was nothing to prevent her from seeing what was in front of her, Mrs. Taylor conceded, but she "didn't see" the depression. She might have seen it if she had looked straight down but, she added, one doesn't "go around the world looking down all the time." No one denied the existence of the depression but there was some disagreement as to the extent of it. A police officer who came to the assistance of Mrs. Taylor said there was "a depression in the macadam." Mrs. Wicks said "if you stepped on the edge of it, it would throw you." Mr. Berryhill called it a "slight depression." Mr. McClung, the assistant store manager, also described it as a "slight depression." However, he said a color photograph taken 14 August by Mr. Taylor "fairly represents" the condition. Mr. Taylor found the depression to be 3 inches deep by actual measurement. The deepest part of the depression was "very small." From the step down it was "more deeply sloped."

At the conclusion of the plaintiffs' case Hutzlers' motion for a directed verdict was denied. Thereupon Hutzlers rested and renewed its motion which again was denied. Finding "no substantial conflict in the evidence which would require the sub-

mission of the issue for the determination of the jury," Judge Jenifer ruled as a matter of law that Mrs. Taylor was an invitee rather than a licensee and proceeded to instruct the jury on that basis. Motions for a new trial and for judgment N.O.V. were denied.

## I.

In an opinion setting forth his reasons for denying the motions for a new trial and for judgment N.O.V., Judge Jenifer stated that he found our holding in *Crown Cork and Seal Co. v. Kane*, 213 Md. 152, 131 A. 2d 470 (1957) to be controlling. In that case Kane, a helper on a truck waiting for a load at Crown Cork and Seal Company's loading dock, went to a room in the cellar of a warehouse which was the only place where the company permitted employees to smoke. He was sent there by checkers employed by the company. Other truckers were known to have used the room. This was disputed, however, by the foreman of the shipping department. As he was returning to his truck he was struck and injured by one of the company's fork lift trucks. It was conceded he was an invitee when he came upon the premises. The question was whether his status as an invitee changed to that of mere licensee when he went to the smoking room. Crown Cork and Seal Co. contended Kane, in going to and from the smoking room, was not acting for their mutual benefit nor was he promoting any of its business interests. Judge Henderson (later Chief Judge), for the Court, discussed the cases that proceed upon the benefit theory but he felt that, in many instances, they relied "upon rather remote and indirect benefits." He went on to say:

> "* * * But there is another theory of liability for negligence that does not depend on mutual benefit at all. The cases all recognize that an invitation may be express or implied, and there are many cases in which an invitation has been implied from circumstances, such as custom, the acquiescence of the owner in habitual use, the apparent holding out of premises to a particular use by the public, or simply in the general arrangement or design of the premises.
>
> "This theory is strongly supported by the most re-

cent commentators on the subject. For a full discussion, see *Prosser, Torts* (2d Ed.), § 78, and *Harper & James, Laws of Torts* (1956 Ed.), § 27.12. It is pointed out that the test of mutual benefit, in its extended form, makes liability depend in many instances upon the undisclosed intention of the visitor, a subjective test, whereas the other theory is objective in that it stresses custom and the appearance of things. It is said that the pecuniary benefit stressed in the *Restatement, Torts*, §§ 332, 343, was a minority view advocated by Bohlen, its distinguished reporter. *Prosser, supra* (p. 456), says: 'The Restatement notwithstanding, the second theory [implied invitation] is now accepted by the great majority of the courts, and many visitors from whose presence no shadow of pecuniary benefit is to be found are held to be invitees.' In dealing with the area of invitation (p. 458), he says, in effect, that liability depends upon the evidence of encouragement to go to the unusual place." *Id.* at 159.

Judge Henderson observed that the theory of implied invitation had been recognized in a number of Maryland cases, although they were, in fact, rested, in whole or in part, upon circumstances indicating at least some economic benefit. After discussing a number of those cases and some of the decisions of other courts, he concluded:

"In the instant case, we think there was evidence to support an implied invitation. The facts that the room was set aside for smoking, that its location was made known to the plaintiff by the checkers on two occasions, that it was habitually used by visiting truckers, and this fact was known to the foreman and the other employees, the absence of any notice to the plaintiff that it was intended solely for employees, and other circumstances in the case, lead us to the conclusion that there was legally sufficient evidence to take the case to the jury on this theory." *Id.* at 162.

Judge Prescott (later Chief Judge), dissenting in *Kane,* said that while he had "no quarrel with the principles of law rel-

ative to 'implied invitation,'" he felt the facts did "not warrant the finding that * * * [Kane] was an 'invitee' under either [theory]." See also *Aravanis v. Eisenberg,* 237 Md. 242, 206 A. 2d 148 (1965); Note, *Implied Invitation,* 18 Md. L. Rev. 338 (1958).

The comment of the Kansas Supreme Court in *Campbell v. Weathers,* 153 Kansas 316, 111 P. 2d 72 (1941) is of interest. There the plaintiff had been a regular customer of a restaurant for a number of years. He was injured in the restaurant on a Sunday morning while on his way to a toilet in the rear which he had used many times before. He had not made a purchase on that morning nor had he yet decided to make a purchase. The court said:

> "'The writer cannot subscribe to the theory that a regular customer of long standing is not an invitee to use toilet facilities required by law to be provided by the operator of a restaurant, simply because the customer had not actually made a purchase on the particular occasion of his injury, prior to his injury. It would seem doubtful whether such a doctrine could be applied justly to regular customers of a business which the law does not specifically require to be supplied with toilet facilities but which does so for the convenience or accommodation of its guests. Women do a great deal of shopping. They sometimes shop all day in their favorite stores and sometimes fail to make a single purchase. Shall courts say, as a matter of law, they were not invitees of the business simply because on a particular occasion they had not yet made a purchase?"

* * *

> "It is true, in the instant case, there was no direct evidence of appellant's intention to make a purchase on this particular occasion. We cannot, however, well ignore the pertinent fact that this appellant had been a customer of lessee of long standing. He had patronized lessee's business for a number of years and had done so whenever he was in town. In view of this record, we think it unreasonable to say, as a matter of

law, appellant lost his status as an invitee, simply because he had not actually made a purchase prior to his injury on this single occasion, or because the record did not affirmatively disclose he actually intended to make a specific purchase presently or in the future. There is nothing in the record which remotely indicates appellant had abandoned his practice to continue patronizing the lessee and his presence there on this occasion is some evidence he had not abandoned such previous custom." *Id.* 111 P. 2d at 76-77.

In *Leighton v. Dean,* 117 Me. 40, 102 Atl. 565 (1917), a pedestrian, while waiting for a streetcar, stood on a 3 foot strip of sidewalk, actually private property, looking at a window display. She was injured when the awning fell. The court held that she was on the strip as an "invited licensee," although she had no intention of entering the store and transacting any business therein. An oft quoted comment of the court follows:

"The defendant contends that the plaintiff was, at most, a mere passive licensee to whom he owed no duty except not to do wanton injury. McClain v. Caribou National Bank, 100 Me. 437, 62 Atl. 144. With this we cannot agree. The window displays by abutting retail salesmen are among the most common and effective methods of advertising. They challenge the attention of the public and invite and induce closer inspection of the dealer's wares. It is not expected that all who stop to gaze should become immediate purchasers, but all are invited that some may be persuaded." *Id.* 102 Atl. at 565.

All things considered, we are persuaded that Mrs. Taylor was an invitee under either theory. In discussing the implied invitation theory in *Kane, supra,* Judge Henderson suggested that the design and general arrangement of the premises may in themselves be an inducement to the public to make use of the parking area. A glance at the plat makes it clear that no effort has been spared to make access to the premises easy and safe, and the general arrangement of the parking area as well

as the large number of spaces insure the likelihood that a place to park will be available. It seems obvious to us that the public is invited to enter, make use of the parking area and visit the stores, all to the end that lookers may become buyers. As the Maine court put it, "all are invited that some may be persuaded." *Leighton v. Dean, supra.* Judge Henderson, in *Kane, supra,* attributes to Prosser the statement that "liability depends upon the evidence of encouragement to go to the unusual place." Towson Plaza (including Hutzlers) certainly qualifies as an "unusual place" and there can be no doubt the public is daily encouraged to go there. Hutzlers chose to argue the economic benefit theory. It is urged that Mrs. Taylor came upon the property solely for the benefit and convenience of herself, without any knowledge on the part of Hutzlers and with no intention of buying anything in its store. She testified, however, that she intended to do her grocery shopping in Towson Plaza at the Food Fair. This testimony was not contradicted; indeed, it was corroborated by Mrs. Wicks. Since Towson Plaza is a lessee of Hutzlers, the economic benefit to Hutzlers as a result of any shopping Mrs. Taylor might do is, to be sure, both remote and minimal but it is real, nonetheless. Mr. Hutzler recognized that the parking lot would be used by others when he said, "We want to keep the parking lot *as much as possible* for Hutzlers' customers." (Emphasis supplied.) Whether Mrs. Taylor parked in one of the spaces leased by Hutzlers to Towson Plaza or in one of the spaces retained by Hutzlers we think makes no difference, considering the physical arrangement of the area and especially in light of the 1949 agreement. Nor can we see that it makes any difference that she used the upper deck rather than the lower level. In the absence of any signs limiting or restricting the use of any of the parking spaces, where she put her car was entirely within her discretion. It is true that Hutzlers discouraged parking in its area until 9:30 A.M., a half hour before the opening of the store. After that, however, no attempt was made to control parking.

## II.

Hutzlers insists there was no evidence of its negligence. We do not agree. Mr. Taylor testified that the "deepest part of

the depression was very small" and that its maximum depth was 3 inches. The photograph taken by him seems to us to support his testimony. Mrs. Wicks said it would "throw you" if "you stepped on the edge of it." In *Town of Princess Anne v. Kelly*, 200 Md. 268, 89 A. 2d 594 (1952), where a similar situation prevailed, Judge Henderson, for the Court, noted that "in a number of Maryland cases relatively slight depressions or projections have been held to furnish a basis of liability." He went on to say:

> "The cases in other states differ widely on what is considered a dangerous condition and what is merely a trivial defect. See note 119 A.L.R. 161. But as we stated in *Leonard v. Lee, supra*, 191 Md. at page 435, 62 A. 2d at page 263: 'The better considered authorities, however, hold that, on the facts in each case, the court should determine whether there is sufficient evidence of the gravity of the alleged defects to permit a jury to consider the question of negligence.' Clearly the matter cannot be reduced to a mathematical formula." *Id.* at 273.

Judge Jenifer was correct, we think, in submitting the issue of primary negligence to the jury. In passing, it will be observed in *Town of Princess Anne, supra*, where the depression had an average depth of ½ inch and a maximum depth of 1¾ inches below the level of the rest of the sidewalk the issue of primary negligence was submitted to the jury.

### III.

Finally, Hutzlers contends Mrs. Taylor was contributorily negligent as a matter of law, citing *Ensor v. Ortman*, 243 Md. 81, 220 A. 2d 82 (1966); *So. Md. Elec. Coop., Inc. v. Blanchard*, 239 Md. 481, 212 A. 2d 301 (1965); and *Sugar v. Traub*, 233 Md. 320 196 A. 2d 869 (1964), all of which are easily distinguishable from the case at bar. Much emphasis, however, is placed on the following quotation from *Tyler v. Martin's Dairy, Inc.*, 227 Md. 189, 175 A. 2d 587 (1961): "To walk blindly or unlooking in a strange environment, when there is no need to do so, is to be negligent as a matter of law. [Citing cases.]"

If this statement by Judge Hammond (now Chief Judge) is placed in its proper context it will readily be seen that the facts in *Tyler* were quite different from the facts in the instant case. The full paragraph follows:

> "She was in an unfamiliar place. She had been shown a safe way to walk to the entrance to the dairy to which she wanted to go. Instead of following this route, she chose to walk a different way, either blinded by a glare of light from inside the building, according to her version, or in such darkness that she could have seen the curbing only with difficulty, if the version of the son and daughter-in-law is correct. She did not look aside and wait until she could recover from the glare and she never looked down to ascertain if there were obstructions in her path. To walk blindly or unlooking in a strange environment, when there is no need to do so, is to be negligent as a matter of law. *Hyde v. Blumenthal*, 136 Md. 445; *Nocar v. Greenberg*, 210 Md. 506, 516; *Sutton v. Mayor & C. C. of Baltimore*, 214 Md. 581; *cf. Pierce v. Mayor & C. C. of Baltimore*, 220 Md. 286. And see also 1 *Shearman and Redfield on Negligence* (Rev. ed.), Sec. 131; Annotation, 'Entering Dark Place on Unfamiliar Premises as Contributory Negligence,' 163 A.L.R. 587, 590." *Id.* at 192.

There is no evidence that Mrs. Taylor, in her previous use of the stairway, had ever become aware of the condition of the macadam adjacent to the top step. The nature of the condition was such that one might have walked across it dozens of times either without noticing it at all or, if noticing it, without suspecting its harmful potential. Mrs. Taylor's earlier use of the stairway might well have been as remote as 2 or 3 years before the accident and, for all the evidence discloses, the condition of the macadam, at that time, might not have been dangerous. It must be conceded that the depression was obvious to anyone who might have looked at it but this does not mean that everyone was likely to see it. We think the jury might well have found that one ordinarily would not expect to find such a defect adjoining the top step of a steep stairway and that Mrs.

Taylor was entitled to assume that the walkway, which Hutz-lers was obliged to maintain, was safe for her use and that she would be warned of an unsafe condition. *Rawls v. Hochschild, Kohn & Co.,* 207 Md. 113, 113 A. 2d 405 (1955) and the cases therein cited. See also James, *Tort Liability of Occupiers of Land,* 63 Yale L. J. 605, 625-26 (1954). Judge Jenifer was correct in submitting the issue to the jury.

*Judgments affirmed.*
*Costs to be paid by the appellant.*