Patrick A. BUTCHER and Lisa
A. Butcher

v.

ROBERTSHAW CONTROLS COMPANY;
Rheem Manufacturing Company, T/A
Ruud Manufacturing Company; and
Arundel Gas & Water Conditioning
Company.

Civ. No. HM81–72.

United States District Court,
D. Maryland.

July 31, 1981.

694

J. James McKenna, Rockville, Md., for Patrick A. and Lisa A. Butcher.

Eugene A. Edgett, Jr., Baltimore, Md., for Liberty Mut. Ins. Co.

E. Charles Dann, Jr., Daniel J. Moore, and Semmes, Bowen & Semmes, Baltimore, Md., for Robertshaw.

William N. Zifchak, Upper Marlboro, Md., and Pamela A. Bresnahan, Baltimore, Md., for Rheem.

Kevin J. McCarthy and O'Malley, Miles, Farrington & McCarthy, Upper Marlboro, Md., for Arundel Gas & Water Conditioning Co.

## MEMORANDUM OPINION

HERBERT F. MURRAY, District Judge.

Plaintiff Patrick A. Butcher and his wife filed the instant action seeking damages for severe burns sustained by Patrick A. Butcher over 85% of his body as a result of an explosion of a gas-run hot water heater. The explosion and resulting fire were caused by the ignition of propane gas which had leaked from the heater or its controls. The heater was manufactured by the defendant Rheem Manufacturing Company, T/A Ruud Manufacturing Company, and was equipped with an automatic gas shut-off device manufactured by the defendant Robertshaw Controls Company. Also named as a defendant is the Arundel Gas & Water Company, which supplies the gas and services the hot water heater.

As both the plaintiffs and defendant Arundel are Maryland citizens, this case is not brought under the diversity jurisdiction, notwithstanding the source in state law of most of the causes of action incorporated into the complaint. All of these state-law claims (*i.e.* fraud and deceit, strict liability, negligence and loss of consortium) are pendent to the one federal question alleged, which is the alleged violation of the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.,* ("CPSA" or "the Act"). Defendants have moved to dismiss the complaint on the basis of lack of subject matter jurisdiction, asserting that CPSA provides no express private right of action for a consumer absent a violation of a "consumer product safety rule", as that term is defined by the Act.[1]

### I

CPSA was enacted by the 92nd Congress on October 27, 1972, along with explicit Congressional findings of fact and statements of purpose.[2] Briefly, the Act is

---

1. Subject to exceptions not here relevant, the term "consumer product" was defined by Congress to include "any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption, or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise...." 15 U.S.C. § 2052(a)(1).

The term "consumer product safety rule" is defined as "a consumer products safety standard described in section 2056(a) of this title, or a rule under this chapter declaring a consumer product a banned hazardous product." 15 U.S.C. § 2052(a)(2). Typically, consumer product safety standards promulgated under § 2056(a) consist of various types of requirements, among which may be the requirement "that a consumer product be marked with or accompanied by clear and adequate warnings or instructions...." § 2056(a)(2).

2. 15 U.S.C. § 2051. Congressional findings and declaration of purpose

   (a) The Congress finds that—

   (1) an unacceptable number of consumer products which present unreasonable risks of injury are distributed in commerce;

   (2) complexities of consumer products and the diverse nature and abilities of consumers using them frequently result in an inability of users to anticipate risks and to safeguard themselves adequately;

   (3) the public should be protected against unreasonable risks of injury associated with consumer products;

intended for the protection of the public against unreasonable risks of injury associated with "consumer products", a term which is to be liberally construed in accordance with the statute's patently remedial purpose. *United States v. One Hazardous Product Consisting of a Refuse Bin,* 487 F.Supp. 581 (D.N.J.1980); *Consumer Product Safety Comm'n v. Chance Mfg. Co.,* 441 F.Supp. 228 (D.D.C.1977). The Act established a new federal agency, the Consumer Product Safety Commission ("CPSC" or "the Commission"), to conduct studies, tests and investigations relative to the safety or hazards of various consumer products, maintain an Injury Information Clearinghouse for the collection, analysis and dissemination of injury data, and promulgate consumer product safety standards where necessary in order to prevent or reduce unreasonable risks of injury. 15 U.S.C. §§ 2054, 2056. Only "consumer products" may be regulated by the Commission, *Southland Mower Co. v. Consumer Product Safety Comm'n,* 619 F.2d 499 (5th Cir.1980), the idea being to exclude from the Act's coverage those articles which are not customarily produced or distributed for sale to, or use by, or enjoyment of members of the consuming public. *Kaiser Aluminum & Chem. Corp. v. Consumer Product Safety Comm'n,* 428 F.Supp. 177 (D.Del.1977), *rev'd on other grounds,* 574 F.2d 178 (3d Cir.), *cert. denied,* 439 U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978). *See* 15 U.S.C. § 2054(a)(1). That the heater and gas shut-off device involved in the instant case are indeed "consumer products" for purposes of the Act is not disputed.

Within its realm of consumer products, the Commission has issued rules which, for purposes of this case, may broadly be classified into two major categories: "consumer product safety rules" and administrative rules. The former is comprised of rules promulgated in order to halt or restrict the sale or manufacture of consumer products deemed unreasonably dangerous to the public. Restrictive rules heretofore promulgated include the imposition of safety standards for architectural glazing materials, 16 C.F.R. § 1201, matchbooks, 16 C.F.R. § 1202, walk-behind power lawn mowers, 16 C.F.R. § 1205, swimming pool slides, 16 C.F.R. § 1207, and cellulose insulation, 16 C.F.R. § 1209. Outright bans have been imposed upon the manufacture of unstable refuse bins, 16 C.F.R. § 1301, extremely flammable contact adhesives, 16 C.F.R. § 1302, lead-containing paint and products incorporating the same, 16 C.F.R. § 1303, and certain items containing respirable free form asbestos, 16 C.F.R. §§ 1304, 1305.

The other major category of rules comprises regulations promulgated in order to facilitate the administration of the CPSC and its statutory duties. Of paramount importance to the efficient functioning of the CPSC is a subset of these administrative regulations comprising what might conveniently be referred to as disclosure rules. Thus Part 1115 of 16 C.F.R., headed "Substantial Product Hazard Reports" is just such a disclosure provision, the purpose of which is to delineate the CPSC's "interpretation of the reporting requirements imposed on *manufacturers (including importers), distributors, and retailers by section* 15(b) of ... [CPSA, 15 U.S.C. § 2064(b)]" and to indicate the actions and sanctions which the Commission may require or impose to protect the public from substantial product hazards, as that term is defined in

(4) control by State and local governments of unreasonable risks of injury associated with consumer products is inadequate and may be burdensome to manufacturers;

(5) existing Federal authority to protect consumers from exposure to consumer products presenting unreasonable risks of injury is inadequate; and

(6) regulation of consumer products the distribution or use of which affects interstate or foreign commerce is necessary to carry out this chapter.

(b) The purposes of this chapter are—

(1) to protect the public against unreasonable risks of injury associated with consumer products;

(2) to assist consumers in evaluating the comparative safety of consumer products;

(3) to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations; and

(4) to promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries.

section 15(a)[3] of the CPSA." 16 C.F.R. § 1115.1 This rule thus implements the statutory directive of 15 U.S.C. § 2064(b), which provides:

> Every manufacturer of a consumer product distributed in commerce, and every distributor and retailer of such product, who obtains information which reasonably supports the conclusion that such product—
>
> > (1) fails to comply with an applicable consumer product safety rule; or
> >
> > (2) contains a defect which could create a substantial product hazard described in subsection (a)(2) of this section,
>
> shall immediately inform the Commission of such failure to comply or of such defect, unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect or failure to comply.

In addition to these two broad categories of rules, there exist rules of a hybrid nature, such as 16 C.F.R. § 1401, which requires manufacturers of self-pressurized products containing chlorofluorocarbons to provide the Commission with specified technical data, and 16 C.F.R. § 1402, which requires manufacturers of radio and television antennae to provide instructions to consumers regarding safe installation methods.

From the foregoing, somewhat cursory review of federal regulation in the field of consumer product safety, it is clear that the Commission cannot and does not rely solely on standards or bans; indeed, without disclosure provisions such as 16 C.F.R. § 1115, it would be impossible for the Commission to gain an awareness of substantial product hazards in order to begin thinking about bans or standards in the first place.

The logic of CPSC's *modus operandi* notwithstanding, the question before the court is whether a member of the general public like Patrick Butcher may maintain a private action for damages against a manufacturer for fraudulent noncompliance with a disclosure rule. Concededly, neither of the manufacturer-defendants violated a consumer product safety rule as none has been issued with respect to the product in question.

Plaintiffs' federal claim is premised on 15 U.S.C. § 2072, which provides:

> (a) Any person who shall sustain injury by reason of any knowing (including willful) violation of a consumer product safety rule, *or any other rule or order issued by the Commission* may sue any person who knowingly (including willfully) violated *any* such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent, subject to the provisions of section 1331 of Title 28 as to the amount in controversy, and shall recover damages sustained, and the cost of suit, including a reasonable attorney's fee, if considered appropriate in the discretion of the court.
>
> (b) The remedies provided for in this section shall be *in addition to and not in lieu of* any other remedies provided by common law or under Federal or State law.

(Emphasis added).[4] The allegedly violated rule is, of course, 16 C.F.R. § 1115, which

---

**3.** 15 U.S.C. § 2064(a) defines the term "substantial product hazard" as either (1) a failure to comply with an applicable consumer product safety rule, which failure creates a substantial risk of injury to the public, or (2) a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public.

**4.** Though not particularly important in this case, it should be noted that the reference in 15 U.S.C. § 2072(a) to the jurisdictional minimum of 28 U.S.C. § 1331 has been effectively repealed by the Federal Question Jurisdictional Amendments Act of 1980, Pub.L. 96–486, 94 Stat. 2369, which has eliminated, effective December 1, 1980, the amount in controversy requirement for federal question jurisdiction. Pursuant to that amendment, 28 U.S.C. § 1331 now reads:

> *Federal Question.*
>
> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

appeared in its original form in the Federal Register of Feb. 19, 1974 and entered into force on March 21, 1974. The rule, as initially promulgated,[5] provided in pertinent part:

1115.4 General requirements.

Every manufacturer of a consumer product distributed in commerce . . . shall immediately inform the Director, Bureau of Compliance, Consumer Product Safety Commission, Washington, D.C. . . . of any defect or failure to comply immediately upon obtaining information . . . which reasonably supports the conclusion that a product contains a defect which creates or could create substantial product hazard.

\* \* \* \* \* \*

**5.** The pertinent provision of the current version of the regulations is 16 C.F.R. § 1115.12 (1980), which provides in relevant part:

Information which should be reported; evaluating substantial product hazard.

(a) *General.* Subject firms should not delay reporting in order to determine to a certainty the existence of a noncompliance or a defect and the substantiality of a possible hazard. The obligation to report arises upon receipt of information from which one could reasonably conclude the existence of a noncompliance or of a defect which could create a substantial product hazard. Thus an obligation to report may arise when a subject firm receives the first information regarding a potential hazard or noncompliance. (See § 1115.14(c).) A subject firm in its report to the Commission need not admit or may specifically deny that the information it submits reasonably supports the conclusion that its consumer product is noncomplying or contains a defect which could create a substantial product hazard within the meaning of section 15(b) of the CPSA. After receiving the report, the staff will preliminarily determine whether the noncompliance or defect presents a substantial product hazard. This determination can be based on information supplied by a subject firm or from any other source. If the matter is adjudicated, the Commission will ultimately make the decision as to substantial product hazard or will seek to have a court make the decision as to imminent product hazard.

\* \* \* \* \* \*

(c) *Death or grievous bodily injury.* Information indicating that a noncompliance or a defect in a consumer product has caused, may have caused, or contributed to the causing, or could cause or contribute to the causing of a death or grievous bodily injury (e.g., mutilation, amputation/dismemberment, disfigurement, loss of important bodily functions, debilitating internal disorders, severe burns, severe electrical shocks, and injuries likely to require extended hospitalization) must be reported, unless the subject firm has investigated and determined that the information is not reportable.

\* \* \* \* \* \*

(f) *Evaluating substantial risk of injury.* Information which should be or has been reported under section 15(b) of the CPSA does not automatically indicate the presence of a substantial product hazard. On a case-by-case basis the Commission and the staff will determine whether a defect or noncompliance exists and whether it results in a substantial risk of injury to the public. In deciding whether to report, subject firms may be guided by the following criteria the staff and the Commission use in determining whether a substantial product hazard exists:

(1) *Hazard created by defect.* Section 15(a)(2) of the CPSA lists factors to be considered in determining whether a defect creates a substantial risk of injury. These factors are set forth in the disjunctive. Therefore, the existence of any one of the factors could create a substantial product hazard. The Commission and the staff will consider some or all of the following factors, as appropriate, in determining the substantiality of a hazard created by a product defect:

(i) *Pattern of defect.* The Commission and the staff will consider whether the defect arises from the design, composition, contents, construction, finish, packaging, warnings, or instructions of the product or from some other cause and will consider the conditions under which the defect manifests itself.

(ii) *Number of defective products distributed in commerce.* Even one defective product can present a substantial risk of injury and provide a basis for a substantial product hazard determination under section 15 of the CPSA if the injury which might occur is serious and/or if the injury is likely to occur. However, a few defective products with no potential for causing serious injury and little likelihood of injuring even in a minor way will not ordinarily provide a proper basis for a substantial product hazard determination.

(iii) *Severity of the risk.* A risk is severe if the injury which might occur is serious and/or if the injury is likely to occur. In considering the likelihood of any injury the Commission and the staff will consider the number of injuries reported to have occurred, the intended or reasonably foreseeable use or misuse of the product, and the population group exposed to the product (e.g., children, elderly, handicapped).

\* \* \* \* \* \*

1115.5  Initial notification.

The initial notification to the Commission shall:

\*      \*      \*      \*      \*      \*

(e) Furnish (to the extent such information is then reasonably available) the data specified in § 1115.7(a).

\*      \*      \*      \*      \*      \*

1115.7  Subsequent notification.

(a) Subsequent notification to the Commission shall be made in writing and shall include, but not be limited to, the information listed below in this paragraph (a). The person(s) responsible for supplying such information is (are) placed in parentheses after each item of information requested. For the purposes of this Part 1115 and in accordance with the Act, "manufacturer" includes any importer of consumer products.

\*      \*      \*      \*      \*      \*

(3) Nature of the potential product hazard (manufacturer, distributor, retailer).

(4) *Date upon which information was obtained which reasonably supported the conclusion that a potential product hazard existed* (manufacturer, distributor, retailer).

(5) *Manner in which information was obtained* supporting the existence of a potential product hazard, *such as consumer complaint,* quality control testing, etc. If consumer complaints are involved, copies of such complaints should be forwarded to the Commission. (Manufacturer, distributor, retailer).

(6) Nature of the potential injury associated with the potential product hazard (manufacturer, distributor, retailer).

(7) *Whether injuries have occurred associated with the hazard or potential product hazard.* Include the number, nature, and severity of such injuries. (Manufacturer, distributor, retailer, to the extent known to each). (Emphasis added).

For purposes of this motion, it cannot be questioned, based on the allegations in the complaint, that Rheem and Robertshaw violated this rule. The question is rather whether only the CPSC may sue in federal court based on a violation of this rule, or whether the right to sue extends to an injured member of the public. This is a question of first impression.

Defendants argue that a private right of action has been created only on behalf of those injured by a willful violation of a consumer product safety rule. As Robertshaw argues in one of its memoranda:

[15 U.S.C. § 2072] seeks to butress [*sic*] the efficacy of the rules issued by the Commission for the public's protection and to eliminate the inequity of allowing a consumer who had been injured by a manufacturer's noncompliance with a safety rule to go uncompensated. The term "rules", as used in this provision, obviously intends those regulatory actions taken by the CPSC for the protection of the consuming public. Since such rules have the immediate purpose of limiting the unreasonable dangers in the consumer products market, a consumer injured by a product placed in the stream of commerce in direct violation of an applicable safety standard, ban, or other safety rule (e.g. requirement of proper testing promulgated pursuant to 15 U.S.C. § 2063(b) (1972)) should have a claim against the non-conforming manufacturer or seller. Administrative rules, however, issued to facilitate the operation of the Commission, are not enforceable by the members of the general public but by the CPSC. Thus, 15 U.S.C. § 2072 (1972) provides no private remedy for the violation of an administrative rule.

This argument is unconvincing not only because it ignores the plain language of the statute but also because it is inconsistent with the intent of Congress as it can be divined from the structure of the Act as a whole. Construing this very same statute, the Supreme Court has recently had occasion to observe:

We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to

the contrary, that language must ordinarily be regarded as conclusive. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). What defendants' argument ignores is the emphasized language in the above-quoted § 2072, permitting any person injured by reason of a knowing violation of a consumer product safety rule *or any other rule* to file suit in federal district court. Defendant is correct to point out that "consumer product safety rule" is a term of art, specifically defined in the Act, as hereinbefore noted. If Congress had wished to limit the cause of action to violations of only such safety rules, it could easily have done so, but the inclusion of the phrase "or any other rule" belies any such intention.

Similarly the structure of the Act belies an intention to restrict § 2072 to enforcement of consumer product safety rules. Immediately following § 2072 is another section expressly providing for private enforcement of a consumer product safety rule or a "substantial product hazard" order under § 2064. 15 U.S.C. § 2073. Defendants' construction would thus render § 2072 superfluous, even in the face of manifestly different language choices in §§ 2072 and 2073.

Additional considerations affecting judicial construction of the Act were identified by Judge Thomas Flannery in the following passage:

Remedial safety legislation such as the Act should be broadly construed to effectuate its purpose. *Tcherepnin v. Knight,* 389 U.S. 332, 333, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The court should not create a loophole that might work to the injury of public protection through a technical construction. *Kordel v. United States,* 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948).

*United States v. Anaconda Co.,* 445 F.Supp. 486, 494 (D.D.C.1977). Adopting this approach leads ineluctably to the rejection of defendants' restrictive interpretation of the Act.

Another argument advanced by defendants is based on the language of § 2074(b), which provides:

The failure of the Commission to take any action or commence a proceeding with respect to the safety of a consumer product shall not be admissible in evidence in litigation at common law or under State statutory law relating to such consumer product.

Defendants argue that because the CPSC failed to take any action based on the information they had provided, no suit can be maintained in federal court because § 2074(b) disables a party from introducing evidence of the sort contemplated in this lawsuit. This argument is frivolous. Firstly, § 2074(b) applies only to suits at common law or under State statutes, not to an action brought under CPSA. Secondly, the statute is obviously aimed at the same concerns that underlie Fed.R.Evid. 407–410, except with a reverse orientation; those evidentiary rules are designed to prevent inferences of guilt or liability being drawn from the performance of specified acts, and § 2074(b) is designed to prevent inferences of non-culpability or non-liability being drawn from the agency's failure to act. Thirdly, it would defy established notions of equity to permit defendants charged with fraud and deceit to profit from their actions by obstructing the plaintiff's proof of causation based on a statute such as § 2074(b), particularly when § 2074(a) makes it clear that Congress did not intend a manufacturer's *compliance* with consumer product safety rules *or other rules* to preclude its liability at common law or under a state statute.

Yet another contention advanced by defendants is that judicial precedent supports the view that no private cause of action exists under CPSA absent valid regulatory action by the Commission, citing *Riegel Textile Corp. v. Celanese Corp.,* 493 F.Supp. 511, 518 (S.D.N.Y.1980). Defendants' reliance on *Riegel* is misplaced, however, as that case was brought under the Federal Hazardous Substance Act, 15 U.S.C. § 1261 *et seq.* ("FHSA"). The question confronting the court in *Riegel* was whether the plaintiff textile manufacturer had an im-

plied private cause of action under FHSA against the manufacturer of the flame retardant "Tris" for lost profits and other damages incurred as a result of the discovery of known carcinogens in Tris' chemical makeup. In its discussion of the applicable statutory provisions, the court noted:

> Two provisions of the Consumer Product Safety Act of 1972 are also relevant to the Federal Hazardous Substances Act. 15 U.S.C. § 2079(a) transfers the functions of the then-Secretary of Health, Education and Welfare under the Federal Hazardous Substances Act to the Consumer Product Safety Commission. Section 2079(d) provides that a consumer risk which could be covered by action under the Federal Hazardous Substances Act may not be regulated under the more general provisions of the Consumer Product Safety Act unless the Commission finds by rulemaking, in accordance with the informal procedures of 5 U.S.C. § 553 of the Administrative Procedure Act, that "it is in the public interest to regulate" under the Consumer Product Safety Act. . . .

*Id.* at 516. As fabric treated with Tris could be covered by action under FHSA (and actually was banned pursuant to that authority, *see* 42 Fed.Reg. 28,060, although that ban was subsequently struck down in *Spring Mills, Inc. v. Consumer Product Safety Commission,* 434 F.Supp. 416 (D.S.C. 1977)) and as the CPSC had not promulgated a rule declaring it to be in the public interest to regulate such products under CPSA, the private remedy provision, 15 U.S.C. § 2072 was unavailable to Riegel. Furthermore, the court observed, § 2072 was intended to confer a private cause of action to members of the consuming public and did not authorize suits by one manufacturer against another. *Id.* at 518, citing *Plaskolite, Inc. v. Baxt Industries, Inc.,* 486 F.Supp. 213 (N.D.Ga.1980). Plainly, then,

the *Riegel* decision is not authority for the proposition argued by defendants in the case at bar.

Finally, defendants have presented the "floodgates" argument, contending that to permit the instant cause of action would "federalize" the law of products liability by giving every plaintiff who alleges noncompliance with a CPSC rule a federal forum. But perhaps that is precisely the result intended by Congress. The Congress made express findings that "control by State and local governments of unreasonable risks of injury associated with consumer products is inadequate and may be burdensome to manufacturers", 15 U.S.C. § 2051(a)(4), and that "regulation of consumer products . . . is necessary to carry out [the protection of the public against said unreasonable risks of injury]." § 2051(a)(6). In view of these findings and the declarations of purpose that follow them, see n. 1, *supra,* defendants' "floodgates" argument is entirely unconvincing. Additionally, it must be remembered that empty allegations of noncompliance with CPSC rules in other cases will be susceptible to disposition by summary judgment, resulting in the dismissal of pendent state claims for lack of the federal question jurisdiction upon which they depend.[6]

Accordingly, defendants' motions to dismiss for lack of subject matter jurisdiction will be denied, the court finding that it has federal question jurisdiction over the cause of action brought under the CPSA[7] and that it is proper to exercise pendent jurisdiction over the state-law causes of action arising out of the same set of facts. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The remainder of Rheem's and Robertshaw's motions dealing with the adequacy of these pendent claims under Maryland law will now be considered as motions under Rule 12(b)(6).

---

**6.** Of course, an independent basis of federal jurisdiction such as diversity of citizenship may also exist in a great many of these cases, as it would have in the instant case but for the naming of Arundel Gas & Water Co. as a defendant.

**7.** The court is grateful for the memoranda, submitted on request, concerning the possibility of an implied private right of action, but in view of the present disposition of the case, that secondary issue will not be reached.

## II

Count I of the complaint alleges a scheme of fraudulent and deceitful conduct, and defendants have moved to dismiss this count on two grounds: first that the complaint does not allege fraud with sufficient particularity to satisfy the requirements of Fed.R.Civ.P. 9(b), and second that the complaint fails to satisfy the elements of fraud and deceit under Maryland law.

■ In *Oliver v. Bostetter,* 426 F.Supp. 1082, 1089 (D.Md.1977), Judge Blair noted:

Rule 9(b) must be read in conjunction with Rule 8 which contains the provisions creating the "notice" pleading which is the hallmark of the federal rules. Rule 9(b) requires more than mere notice in cases of fraud; nevertheless, it is not to be construed and applied in a vacuum devoid of Rule 8's existence. *Tomera v. Galt,* 511 F.2d 504 (7th Cir.1975); Wright & Miller, Federal Practice & Procedure: Civil § 1298.

Rule 9(b) requires particularity in the pleading of the "circumstances" of the fraud; that is, the rule requires presentation of the situation out of which the claim. . . .

Even a cursory reading of paragraphs 15–31 of the complaint cannot fail to reveal the facts and circumstances therein averred which give rise to the action for fraud and deceit. In brief, the complaint alleges that notwithstanding knowledge of numerous accidents resulting in severe personal injuries, deaths, and property damage, starting as early as 1955 and occurring every year thereafter, defendants Robertshaw and Rheem disseminated no warnings within the relevant industry as to any product hazard and, in 1974, informed the CPSC only of a "potential defect" just discovered, divulging nothing about the extent and number of injuries caused by the product over the previous twenty years. Plaintiff Patrick Butcher claims that the injuries he has sustained could have been prevented but for the "cover up" he alleges. The complaint, then, sets forth the facts with sufficient particularity to support a claim for fraud and deceit for purposes of Rule 9(b).

■ Under the substantive Maryland law, a claim for fraud and deceit is insufficient unless it alleges five essential elements:

(1) that a representation made by a party was false;

(2) either that the falsity was known to the party making the representation or that the representation was made with such reckless indifference to its truth or falsity as to impute knowledge to said party;

(3) that the false representation was made for the purpose of defrauding some other person;

(4) that the person allegedly defrauded not only relied upon the misrepresentation, but had the right to rely upon it with full belief in its truth, and that he would not have done the thing from which damages resulted but for the misrepresentation; and

(5) that the person allegedly defrauded suffered damages directly resulting from said misrepresentation.

*Suburban Properties Management, Inc. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326, 329 (1964); *Colandrea v. Colandrea,* 42 Md.App. 421, 401 A.2d 480 (1979); *Columbia Real Estate Title Co. v. Caruso,* 39 Md.App. 282, 384 A.2d 468 (1978); *Lustine Chevrolet v. Cadeaux,* 19 Md.App. 30, 308 A.2d 747 (1972).

For purposes of this motion, the court accepts as true the allegation that defendants made misrepresentations to the CPSC. Defendants nonetheless contend that no claim for fraud will lie under Maryland law absent a misrepresentation made to the complaining party; as there is no allegation of any such misrepresentation made directly to the Butchers, defendants would have this court dismiss the count sounding in fraud and deceit. Plaintiffs, for their part, do not quarrel with defendants' exposition of state law, but argue instead that an agency relationship exists between the CPSC and all members of the consuming public in the United States, a class which perforce includes the plaintiffs. Before examining the merits of this novel proposition

of law, the inquiry must be whether the existence of such an agency relationship would rehabilitate plaintiffs' fraud count.

Certainly, it is hornbook law that a fraud worked upon an agent by a third person is deemed to have been worked upon the principal. *See* Restatement (Second) of Agency, § 315 (1957); 3 Am.Jur.2d § 290 & n. 5 (1962). Defendants maintain that the element of causation is missing, arguing that the CPSC took no action against the product in question and that the inactivity of the Commission may not be admitted into evidence. This argument, inasmuch as it is based on § 2074(b), has previously been rejected, *ante* at 7; and while it may be difficult for plaintiffs to establish that but for the alleged misrepresentations and concealments the CPSC would have acted and that but for the CPSC's inaction the calamity would never have occurred, those elements of proof must await trial.

Thus it is necessary to decide whether, as a matter of law, plaintiffs enjoyed an agency relationship with the CPSC. To be sure, no *express* agency agreement was ever drawn up between the Butchers and the Commission. Instead, plaintiffs premise their argument on the express purposes and findings stated by the Congress at the head of the Act and quoted *supra* in note 2. Plaintiffs emphasize the purposes of the Act enumerated as § 2051(b)(1) and (b)(2), to wit: "to protect the public against unreasonable risks of injury associated with consumer products" and "to assist consumers in evaluating the comparative safety of consumer products."

Defendants cite *McLaughlin v. Copeland,* 435 F.Supp. 513 (D.Md.1977) for the proposition that agency is a consensual relationship that is formed and governed by the intention of the parties and is created either by an express grant of authority or by implied authority, such as by conduct that misleads a third party to his detriment. *Borg-Warner Acceptance Corp. v. Rossi,* 365 F.Supp. 56 (D.Md.1972). From this defendants argue that the complaint contains no allegations that the CPSC acted in such a manner as to create in third parties the reasonable apprehension that it was acting as plaintiffs' agent. In defendants' view:

> The taxes paid by Butcher presumably help support the entire panoply of those federal, state, and local agencies which were created to serve the public interest. This fact alone cannot support a legally sufficient finding of agency between each individual taxpayer and every governmental agency and subdivisions. The CPSC is no more the agent of Butcher than is the Defense Department, the Federal Trade Commission, or the Library of Congress, although each of these institutions are [sic] supported by taxes and further [sic] the public interest.

Reply Memorandum of Defendant Robertshaw Controls Co. at 12.

This argument is reminiscent of the lack of standing arguments generally advanced in taxpayer lawsuits, namely that the plaintiff is seeking to litigate what is fundamentally a *generalized* injury shared equally by all members of the general public. *See, e.g., Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (suit by taxpayer to restrain, as violative of the Tenth Amendment, expenditures under the Maternity Act of 1921, which provided conditional grants to the states to reduce infant mortality). *Cf. Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (suit by taxpayer to restrain, as violative of the First Amendment Establishment Clause, expenditures under Titles I and II of the Elementary and Secondary Education Act of 1965, which would provide some financial assistance to parochial schools.). The difficulty with applying this kind of reasoning to the instant case is twofold: first, plaintiffs are far from asserting just a generalized injury but instead seek to recover for massive personal injuries having a substantial nexus to the acts and omissions of the defendants; second, plaintiffs are operating under an explicit legislative grant of standing to sue, as this court has already found, and to preclude an action to recover for fraud and deceit would be contrary to the broad remedial purposes of the CPSC. In providing this private right of action

under the Act, Congress expressly observed that "[t]he remedies provided for in [§ 2072] shall be in addition to *and not in lieu* of any other remedies provided by common law or under Federal or State law." 15 U.S.C. § 2072(b) (emphasis added). It perhaps states the obvious to observe the difference between a fraud perpetrated on the CPSC and a fraud perpetrated on the Defense Department, the F.T.C.,[8] or the Library of Congress in terms of Congress' views of the effect on consumers: the CPSC's *raison d'etre* is the protection of consumers against the *unacceptable* number of consumer products which present *unreasonable* risks of individualized injury. Presumably if the consuming public were able adequately to protect itself against these perils, Congress would have found it unnecessary to create a "knight in shining armor" in the guise of the CPSC. To permit a manufacturer to subvert Congress' purpose by disallowing private claims for redress of injury related to an alleged fraud upon the Commission exceeds the tolerance level of a court of equity.

■ Accordingly, the court holds that an agency relationship exists, as a creature of statute, between the CPSC and members of the consuming public so as to permit the maintenance of an action for fraud and deceit by consumers injured by such fraud and deceit allegedly practiced on the Commission, provided, of course, that the requisite degree of causation may be established.

### III

Plaintiffs allege in the third count of the complaint that the automatic gas shut-off device manufactured by Robertshaw was of defective workmanship and design and was negligently constructed and improperly tested. Alleging further that such defects and manner of construction were well known to the defendants, the plaintiffs in their third count seek to recover for breach of express and implied warranties. Defendants have moved to dismiss this count on

two grounds: first that the claim is barred by the statute of limitations and second that the law precludes recovery absent privity of contract. Additionally, defendants seek to dismiss the claim for punitive damages under this count.

With regard to the defense of limitations, the parties are agreed that the time at which a cause of action accrues is a judicial (rather than a legislative) determination. *Harig v. Johns-Manville Products,* 284 Md. 70, 394 A.2d 299 (1978). In *Goldstein v. Potomac Electric Power Co.,* 285 Md. 673, 404 A.2d 1064 (1979), the Maryland Court of Appeals noted the general rule in this State that limitations run from the date of the alleged wrong and not from the date of its discovery. However, in that same opinion, it was recognized that this general principle is subject to a number of exceptions relating to situations in which the injury cannot have been discovered, even by the exercise of due diligence. A prime example of this principle is codified in Md.Courts and Judicial Proceedings Code Ann. § 5–203, which provides:

> If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

This remedial statute was enacted for the purpose of enabling the plaintiff in an action at law to set up the fraud of the defendant in order to avoid the plea of limitations, *Herring v. Offutt,* 266 Md. 593, 295 A.2d 876 (1972); *Piper v. Jenkins,* 207 Md. 308, 113 A.2d 919 (1955), and has been held to halt the running of the statute of limitations. *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972). *See Sasso v. Koehler,* 445 F.Supp. 762 (D.Md.1978).

■ The fraud referred to in § 5–203 may be an actual concealment of facts or it may be of such a character as to conceal itself, so long as the plaintiff remains in

---

**8.** The CPSA actually transferred several of the functions of the Federal Trade Commission to the CPSC. *See, e.g.,* 15 U.S.C. § 2079(b) & (c).

*See also* Conf.Rep. No. 92–1593, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4596, 4628.

ignorance without any lack of diligence on his part. *Brack v. Evans,* 230 Md. 548, 187 A.2d 880 (1963).

■ In this case it is alleged that both Robertshaw and Rheem deliberately kept silent for a period of 26 years as to the dangers inherent in normal use of the device in question. Plaintiff alleges that he first became aware (and indeed was first in a position to become aware) of the alleged wrong on August 20, 1980, when he sustained the severe burns already alluded to. Obviously, the filing of the instant suit is well within the three-year period of limitations which began to run from that date.

■ With regard to the requirement in Maryland of privity in an express or implied warranty action, on the other hand, defendant must prevail. The product in question was manufactured and sold in the 1950s, and therefore the law governing the transaction was the Uniform Sales Act, which was codified at Md.Ann.Code, art. 83, §§ 53–96 (1957). Under the version of the Sales Act adopted in Maryland, a plaintiff, in order to recover for an alleged breach of warranty, had to plead and establish privity of contract. *Blankenship v. Morrison Machine Co.,* 255 Md. 241, 257 A.2d 430 (1969). Privity was deemed necessary not because the cause of action sounded in contract, but because it was necessary to establish a direct contractual relationship in order to create a warranty and the concomitant duty. *State t/u/o Bond v. Consolidated Gas, Electric Light & Power Co.,* 146 Md. 390, 126 A. 105 (1924).

Plaintiffs rely on dicta in *Uppgren v. Executive Aviation Services, Inc.,* 326 F.Supp. 709, 716 (D.Md.1971) to support their argument that privity ought not to be required. The question for decision in *Uppgren,* however, was whether an action based on breach of an implied warranty is more akin to tort than contract for purposes of deciding what choice of law rule to apply. It was with regard to this question alone that Judge Miller, in the dicta relied on by plaintiffs, cited the case of *Twombley v. Fuller Brush Co.,* 221 Md. 476, 158 A.2d 110 (1960) to support his conclusion (itself not necessary to the decision in *Uppgren* ) that if faced with the question, the Maryland state courts would regard a breach of implied warranty action as closer to tort than contract. Neither *Twombley* nor *Uppgren* is authority for overruling an established line of Maryland case law requiring privity of contract; indeed, as defendants point out, the court in *Twombley* noted that the parties therein actually were in privity. 221 Md. at 490, 158 A.2d 110.

Therefore, as no allegations of privity of contract are present in Count 3 of the complaint, that count will be dismissed in its entirety. It is therefore unnecessary to decide the matter of punitive damages as to that count.

IV

Defendants have also moved to dismiss claims for punitive damages made under Counts 4, 5, 6 and 7. Because the right to punitive damages depends on different factors in the several counts, separate analyses must be undertaken.

A. *Punitive Damages on the Negligence Count.*

■ Count 4 of the complaint seeks redress for injuries resulting from the "negligence, reckless and wanton conduct of the defendants ... in the design, construction, manufacture, assembly, testing and distribution of the Robertshaw Unitrol Model 200 involved in this accident, including its component parts." Defendants argue that the specific allegations of negligence which Count 4 goes on to detail are insufficient under Maryland law to state a claim for punitive damages, as they fail to meet the requirement that the conduct demonstrates "reckless indifference to the rights of others." Defendants rely on *American Laundry Machinery v. Horan,* 45 Md.App. 97, 412 A.2d 407 (1980) for the proposition that a showing of wanton and reckless conduct requires "direct evidence of substantial knowledge on the part of the manufacturer that the product is, or is likely to become, dangerous, and a gross indifference to the danger." *Id.* at 117, 412 A.2d at 419.

Count 4, however, incorporates by reference all prior allegations made in the complaint. *See* Compl. ¶ 45. Those prior allegations set forth, in great detail, claims of actual knowledge on the part of defendants that the product was highly dangerous and of attempts to *conceal* that danger from the public and from the Commission. Plaintiffs' memorandum in opposition observes that these actions of defendants (which the court takes as true for purposes of this motion only) "make the notion of 'gross indifference' analogous to good conduct when compared to them." However that may be, the court finds the requirements of *American Laundry Machinery* amply satisfied by the allegations of Count 4, and the motion to dismiss the claim for punitive damages as to that count will be denied.

**B.** *Punitive Damages on the Strict Liability Count.*

■ As defendants rightly observe in their motion, the theory of strict liability in tort focuses on the character of the product and not the conduct of the manufacturer. *Phipps v. General Motors Corp.* 278 Md. 337, 344, 363 A.2d 955, 958 (1976). This concept lies at the heart of a legal doctrine that imposes liability without fault and that represents a departure from the general rule that a supplier of chattels was not liable to third persons in the absence of negligence or privity of contract.

On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the con-

sumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement of Torts 2d § 402A, Comment c.

This theory of liability is incompatible with punitive damages, and previous decisions in this district have so held. *See Purcell v. Johns-Manville Corp.*, Civil No. HM80–2610 (D.Md. Jan. 15, 1981); *Filbey v. Johns-Manville Sales Corp.*, Civil No. M80–1646 (D.Md. Oct. 3, 1980); *Riser v. Johns-Manville Products Corp.*, Civil No. N77–1794 (D.Md. Mar. 31, 1978); *Harig v. Johns-Manville Products Corp.*, Civil No. K77–806 (D.Md. Mar. 2, 1978). Accordingly, defendants' motion to dismiss the claim for punitive damages as to Count 5 will be granted.

**C.** *Punitive Damages for Loss of Consortium.*

■ The law is clear in Maryland that a claim for loss of consortium is brought to recover for *injury to the marital unit*, *Deems v. Western Md. Ry. Co.*, 247 Md. 95, 231 A.2d 514 (1967), and is brought by both spouses for the injury to them both, but it is also clear "that the underlying purpose and the rationale of the joint action is to *compensate the individual persons who form that relationship* for the personal injury which they both sustain." *Phipps v. General Motors Corp., supra*, 278 Md. at 355, 363 A.2d 955.

■ The court can find no Maryland decision dealing with the question whether punitive damages are recoverable in such an action. In general, punitive damages are awarded to punish acts of malice or recklessness and to serve as a deterrent against the recurrence of such acts. With respect to the Maryland cases on loss of consortium this court is unable, as was (now Chief) Judge Latchum with respect to the Delaware cases in *Sheats v. Bowen*, 318 F.Supp. 640 (D.Del.1970), to find any distinction drawn between direct and indirect injury to the marital relationship. As de-

fendants evidently do not dispute the Butchers' right to sue for loss of consortium, and as, in Judge Latchum's words, "[e]ntitlement to punitive damages arises out of a malicious, or wanton or reckless violation of a right and not out of the means or instrumentality used to violate such right", *id.* at 648, this court holds that a claim for punitive damages as part of a claim for loss of consortium may be maintained where, as here, plaintiffs have alleged the sort of willful, wanton or malicious conduct that would give rise, in general, to punitive damages under the established decisional law of Maryland.

█ Nor is the claim for punitive damages precluded in the count alleging loss of consortium resulting from violation of a consumer product safety rule. As previously mentioned, 15 U.S.C. § 2072(b) preserves any additional remedies that may be available under common law or under Federal or State law. While the chain of causation may be more attenuated on this count than on the purely state law count, that is surely a matter of proof at trial and is not appropriately determined at this juncture. Therefore, the motion to dismiss the claims for punitive damages as to Counts 6 and 7 will be denied.

### V

█ A jurisdictional question that has been characterized by the Supreme Court as "subtle and difficult"[9] and "subtle and complex"[10] is raised by the separate motion of defendant Arundel Gas & Water Co. to dismiss the complaint against it: the question presented involves the doctrine of "pendent party" jurisdiction.

Arundel quite properly observes that it has been named only in Count 4 alleging negligence and Count 6 which is a derivative claim for loss of consortium based upon the allegations contained in Count 4. No claim is (or could be) made on the facts alleged that Arundel has violated the CPSA. As Arundel is incorporated under the laws of Maryland, no diversity exists. Hence, there is no independent basis for the exercise of federal jurisdiction against Arundel.

Under *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), the yardstick used to take the measure of a case or controversy over which a federal district court could exercise jurisdiction was the cause of action. Traditionally, a claim brought under a federal statute and a claim brought under state law were viewed as separate causes of action. The passage of time has witnessed a considerable broadening of the scope of the term "cause of action", however, *see, e.g., J. Aron, & Co., Inc. v. Service Transportation Co.,* 515 F.Supp. 428 (D.Md.1981), and the Supreme Court in the landmark decision in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) has included in the concept of case or controversy all claims arising out of a common nucleus of operative facts and normally tried together. Since the *Gibbs* decision, the question whether modern pendent jurisdiction doctrine would extend to pendent *parties* (as opposed to claims) has arisen chiefly in two situations: plaintiff seeks to join a federal question claim against one party with a state law claim against another party, or a claim against a nondiverse defendant with a claim against a diverse defendant.

The policy expressly underlying the decision in *Gibbs* was based on "judicial economy, convenience and fairness to litigants." 383 U.S. at 726, 86 S.Ct. at 1139. Concerned that a plaintiff might be faced with the choice of pursuing two overlapping lawsuits simultaneously or foregoing his federal forum, Mr. Justice Brennan's opinion for the Court found that

[p]endent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Trea-

---

9. *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) (per Mr. Justice Marshall).

10. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) (per Mr. Justice Rehnquist).

ties made ... under their Authority ...," U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."

*Id.* at 725, 86 S.Ct. at 1138 (emphasis original; footnote omitted).

The majority of circuits, writing after *Gibbs,* that have considered the question of pendent parties have liberally extended the *Gibbs* doctrine to cases in which an additional party not subject to the federal claim is sought to be joined to answer a state claim. *See, e.g., Bowers v. Moreno,* 520 F.2d 843 (1st Cir.1975); *Florida E. Coast Ry. v. United States,* 519 F.2d 1184 (5th Cir.1975); *Curtis v. Everette,* 489 F.2d 516 (3d Cir.1973) *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *Schulman v. Huck Finn, Inc.,* 472 F.2d 864 (8th Cir. 1973); *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800 (2d Cir.1971); *F.C. Stiles Cont. Co. v. Home Ins. Co.,* 431 F.2d 917 (6th Cir.1970). Of these, perhaps the most influential decision has been Judge Friendly's in *Leather's Best,* a case involving the disappearance of a shipment of furs from an enclosed and guarded pier area after unloading from a sea vessel. Plaintiff, the consignee, sued the vessel *in rem* and the vessel owner *in personam* under the Harter Act, and he sought as well to join the pier operator on an agency theory with a claim of breach of maritime contract. No diversity existed between the plaintiff and the pier operator. Judge Friendly, though rejecting the plaintiff's theory of liability against the pier operator and characterizing it instead as a tort claim under the law of the state of New York, nevertheless held that that claim was within the pendent jurisdiction of the district court. *Accord,*

*Princess Cruises Corp. v. Bayly, Martin & Fay, Inc.,* 373 F.Supp. 762 (N.D.Cal.1974). *See also, Almenares v. Wyman,* 453 F.2d 1075 (2d Cir.1971) (Friendly, J.), *cert. denied,* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); *Astor-Honor, Inc. v. Grosset & Dunlap, Inc.,* 441 F.2d 627 (2d Cir.1971) (Friendly, J.).

In contrast, the Ninth Circuit has steadfastly adhered to the position that *Gibbs* was aimed at joinder of claims and not joinder of parties. *Hymer v. Chai,* 407 F.2d 136 (9th Cir.1969) (jurisdictional amount not met). *Accord, Moor v. Madigan,* 458 F.2d 1217 (9th Cir.1972), *aff'd in part & rev'd in part sub nom. Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Aldinger v. Howard,* 513 F.2d 1257 (9th Cir.1975), *aff'd,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1977).

The weight of authority in the circuits was recognized by Mr. Justice Marshall, writing for the Court in *Moor v. County of Alameda, supra.* In *Moor,* a state law claim against a county was pleaded as pendent to an action against county officials under 42 U.S.C. § 1983. The district court dismissed the state claim, the Ninth Circuit affirmed, and the Supreme Court took the approach that the district court had not abused its discretion under *Gibbs.* Justice Marshall wrote that in view of the discretionary nature of the pendent jurisdiction doctrine as formulated in *Gibbs,* it was unnecessary to address the question of the *power* of the district court to entertain the state claim, characterizing that issue as "subtle and difficult." The Court noted, however, that the Ninth Circuit's approach in *Hymer v. Chai, supra,* stood virtually alone among circuit court decisions.[11]

---

11. Several district court decisions have also aligned themselves against the position taken by the Ninth Circuit. *See Reed v. Philadelphia Housing Authority,* 372 F.Supp. 686 (E.D.Pa. 1974); *Trustees of the Colorado Pipe Industry Employee Benefit Funds v. Colorado Springs Plumbing & Heating Co.,* 388 F.Supp. 71 (D.Colo.1975); *Greenway v. Thompson,* 368 F.Supp. 387 (N.D.Ga.1973); *Jacobs v. United States,* 367 F.Supp. 1275 (D.Ariz.1973); *Tauss*

*v. Rizzo,* 361 F.Supp. 1196 (E.D.Pa.1973). *But cf. Kiss v. Tamarac Utilities, Inc.,* 463 F.Supp. 951 (S.D.Fla.1978) (decided after the Supreme Court's decision in *Aldinger v. Howard* and adopting that approach: held that joining parties who did not participate in conciliation proceedings would frustrate statutory scheme of Title VII, the federal question component of the case).

Another Ninth Circuit decision reviewed by the Supreme Court was *Aldinger v. Howard,* which did not involve a matter of district court discretion, as the district court had dismissed on jurisdictional grounds without adopting a discretionary approach, and the Ninth Circuit affirmed on that basis. Though recognizing that Justice Marshall's dicta in *Moor* weakened the precedential value of *Hymer v. Chai,* the court of appeals declined to reconsider its position using *Aldinger* as a vehicle. On certiorari, Mr. Justice Rehnquist's opinion for the Court affirmed the dismissal, reading the legislative history of the 1871 Civil Rights Act as evidencing Congressional intent to prohibit § 1983 actions against municipalities.[12] Therefore, it made no sense to read § 1983's jurisdictional counterpart, 28 U.S.C. § 1343, as authorizing the exercise of pendent jurisdiction over a claim where Congress had declined to provide original jurisdiction. The majority left the issue of pendent party jurisdiction open, however, in cases where Congress had not acted or displayed an intent to preclude the exercise of federal jurisdiction directly, finding it not only unnecessary but also undesirable to lay down a rule of law on a question so "subtle and complex."

Even within the Ninth Circuit, however, a few seeds of rebellion were sown. In *Princess Cruises Corp. v. Bayly, Martin & Fay, supra,* Judge Zirpoli justified the exercise of jurisdiction over pendent parties by noting the "vast weight of authority" in other circuits as well as the dicta from Justice Marshall's opinion in *Moor.* A more cautious district court in *United Pacific/Reliance Ins. Cos. v. City of Lewiston,* 372 F.Supp. 700 (D.Idaho 1974), while noting that if free to decide the issue the decision would be otherwise, did proper obeisance to the "king of the mountain" (as the court characterized the Ninth Circuit) and applied *Hymer v. Chai* to preclude joining parties as to whom there were insufficient amounts in controversy. The court also noted that the

Supreme Court's decision in *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) appeared to require dismissal of claims under $10,000.

*Zahn* was a class action brought under the diversity jurisdiction by four plaintiffs seeking redress for pollution damage to themselves and to others similarly situated. The Supreme Court affirmed a decision declining to hear any claims of class members that did not *independently* satisfy the $10,000 requirement. In a provocative article, Professor David Currie discusses *Zahn* and the precedent chiefly relied on in *Zahn,* namely *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), which held that claims of class members lacking joint interests could not be aggregated in determining whether there was federal jurisdiction. Professor Currie notes:

> The Court in *Zahn* did not consciously give a narrow construction to the term "civil action"; it thought it was dealing with a "construction of the 'matter in controversy' requirement of § 1332." But it did not hold (and could not very well have held) that the matter in controversy was less than $10,000, for it acknowledged there was jurisdiction over the claims of the named plaintiffs. Jurisdiction, once established as it was in *Zahn,* extends under *Gibbs* to the entire "civil action"; in holding there was no power to entertain the claims of absent class members, the Court must have held they were not part of the same "civil action." It follows that a nonfederal claim against an additional defendant is not a part of the "civil action" over which a federal claim gives jurisdiction unless the defendants share (in *Snyder*'s words) a "common and undivided interest."

Currie, *Pendent Parties,* 45 U.Chi.L.Rev. 753, 757 (citations omitted).

Currie then discusses the "complete diversity" rule of *Strawbridge v. Curtiss,* 7 U.S. 267, 3 Cranch 267, 2 L.Ed. 435 (1806) and later decisions holding that the presence of a nondiverse party destroys jurisdiction

---

12. As noted by Professor Currie, "The overruling of this premise in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which held a local government body a "person" within section 1983, does not affect the present analysis." Currie, *Pendent Parties,* 45 U.Chi.L.Rev. 753, 755 n. 16 (1978).

over the entire suit and not merely over the nondiverse claims. He continues:

> I have argued that *Zahn,* by implicitly holding a "civil action" does not include pendent parties, effectively resolves [the question of pendent party jurisdiction]. The extended *Strawbridge* rule, however, implicitly resolves it the other way. The complete diversity rule ... presupposes that the "matter in controversy" in a "civil action" embraces claims involving multiple parties with nonjoint interests; if the "matter in controversy" is that broad, so is the "civil action" that contains it. History cannot bail us out of this one. The inconsistency is even more obvious under the 1789 statute [now 28 U.S.C. § 1332], which used the same word to express both ideas: there was jurisdiction over the "suit" when the "suit" was diverse. The clear implication of the complete diversity rule is that a single "civil action" includes claims involving multiple, nonjoint parties. Thus, not only does *Zahn* fail to follow from *Snyder* as a matter of either statutory language or policy—*Zahn* is inconsistent with *Strawbridge.*

Currie, *supra,* at 761 (citations omitted).[13]

Stepping back from all this chaos into the comparatively organized framework of the case at bar, it is clear that nothing decided in *Moor* or *Aldinger* (or, for that matter, in *Zahn* or the Ninth Circuit "amount in controversy" decision in *Hymer v. Chai*) precludes the exercise of pendent party jurisdiction over Arundel. The *Aldinger* approach requires an exploration of the intent of Congress in enacting the particular federal statute on which jurisdiction is predicated, but, in contrast to *Aldinger,* there is in this case no indication that Congress wished to forbid the exercise of federal jurisdiction over related claims. To the contrary, CPSA provides that the federal remedy is in addition to and not in lieu of common law remedies. It remains, however, to consider prior decisions by our own Court of Appeals for the Fourth Circuit.

In *Kenrose Mfg. Co. v. Fred Whitaker Co.,* 512 F.2d 890 (4th Cir.1972), it was held that ancillary jurisdiction does not permit a plaintiff to maintain a claim against a nondiverse party impleaded under Rule 14 by a diverse defendant.[14] Then, in *Parker v. W.W. Moore & Sons, Inc.,* 528 F.2d 764 (4th Cir.1975), suit was brought in diversity against a Pennsylvania elevator manufacturer charging breach of warranty and negligence on its part and on the part of a nondiverse installer, in that a particular

**13.** Another case inconsistent with *Zahn* and discussed by Currie is *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921):

> In a class action, the Court held in *Ben-Hur,* diversity will be determined by reference to the citizenship of the original named parties alone; that other members of the plaintiff class may be cocitizens of a defendant is immaterial. To begin with, it is not easy to reconcile this decision with *Strawbridge* unless one concludes that absent members, like trust beneficiaries, are not to be considered parties. Since they are invisible, the existence of absent members will not influence a biased tribunal one way or the other, even though they will be affected by the outcome. This theory, however, appears to be inconsistent with the treatment of absent class members in *Zahn* and *Snyder;* if the named plaintiffs in those cases were effectively trustees for absent class members they should have been allowed, as individual plaintiffs traditionally have been, to aggregate or to append their several claims.

> Indeed, the *Ben-Hur* opinion appears to rely not on the trustee analogy but on the doctrine that the court had jurisdiction, "ancillary" to that over the diverse named plaintiffs, to determine the rights of nondiverse class members....
>
> If ancillary jurisdiction explains *Ben-Hur,* that case remains difficult to square with *Strawbridge,* but only on the question (not relevant to the scope of a "suit" or "civil action") whether "between citizens of different States" requires complete rather than minimal diversity. With respect to the breadth of a "civil action" *Strawbridge* and *Ben-Hur* seem to agree: the "action" includes claims of multiple parties. For this reason it was unfortunate for the Court in *Zahn,* in the face of a dissent invoking *Ben-Hur,* not to address the significance of that decision.

Currie, *supra,* at 762–63 (citations omitted).

**14.** This conclusion has since been validated by the Supreme Court's decision in *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

elevator had not been properly grounded, resulting in the electrocution of plaintiff's decedent. The complaint alleged a master-servant relationship between the installer and the manufacturer and placed liability on the latter on the theory of *respondeat superior.* Judge (then Chief Judge) Haynsworth's opinion recognized that the reasoning underlying the earlier decision in *Kenrose* had been the object of criticism, 528 F.2d at 766 n. 1, but disapproved a district court decision which had held that a contract claim could be asserted in diversity even where there was no diversity between plaintiff and one of the two co-defendants so long as the principal alleged obligor was the diverse defendant. The court of appeals stated:

> We think that a misuse of the pendent jurisdiction doctrine, which was designed to extend federal jurisdiction to encompass pendent state claims against defendants *already in the case* to defend the primary federal claims. It was not designed to bring into the diversity jurisdiction claims between parties who are citizens of the same state.

*Id.* at 766 (emphasis added). While the court intimated that it might be willing to reconsider its decision in *Kenrose* in a context other than the diversity situation, it would appear from the language quoted above that this circuit inclines toward the view previously articulated by Judge Hufstedler in the Ninth Circuit, namely that "[j]oinder of claims, not joinder of parties is the object of the [*Gibbs*] doctrine."

Accordingly, although there is authority elsewhere favoring the exercise of jurisdiction over pendent parties, the view taken in this circuit would seem to dictate granting Arundel's motion to dismiss. However, at least as regards this particular defendant, the ordering of dismissal on jurisdictional grounds constitutes a controlling question of law, and this court is of the opinion that there is substantial ground for difference of opinion (as amply demonstrated from the history recounted above) as to this legal question and that an immediate appeal may materially advance the ultimate termination of this litigation. Accordingly, this court on the issue of pendent party jurisdiction will include a 28 U.S.C. § 1292(b) certification in its order granting Arundel's Rule 12(b)(1) motion to dismiss.